691 A.2d 293

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ADAM MARRERO, DEFENDANT–APPELLANT.

Argued October 8, 1996—Decided March 20, 1997.

*Barbara A. Hedeen,* Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney).

*Paul H. Heinzel*, Deputy Attorney General, argued the cause for respondent (*Peter G. Verniero*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

This appeal involves convictions for purposeful or knowing murder, kidnapping, aggravated sexual assault, and sexual assault. The appeal is of right based on a dissenting vote in an interlocutory appeal and a dissenting vote in a direct appeal. We must decide whether it was reversible error for the Appellate Division to overrule the trial court and order it to permit the State to introduce evidence that defendant was awaiting sentencing on a charge of sexual assault at the time of the murder and other offenses. We must also decide whether the trial court's jury instructions concerning the other-crime evidence were so deficient that they constituted plain error.

I

On Friday, August 26, 1988, F.C. and defendant Adam Marrero met for the first time at a social gathering at the home of F.C.'s aunt. Defendant and F.C. left the party at approximately 11:30 p.m. and went to a bar together. On Saturday morning at 8:20 a.m., F.C.'s daughter arose and noticed her mother's absence. Friends and family were called and a search was conducted for F.C. throughout the entire day. The Vineland police became involved in the case Saturday afternoon.

F.C.'s body was discovered on Monday morning in a remote area surrounding Central Park in Vineland. The body was nude, with legs apart and knees bent. Her arms were extended over her head, as if the body had been dragged. Her clothing was scattered around the area.

A Cumberland County grand jury indicted defendant for murder, felony murder, first-degree kidnapping, first-degree aggravat-

ed sexual assault, and second-degree sexual assault. As a result of a pretrial motion, trial of the case was conducted in Salem County in May 1990. The trial court denied the State's motion to introduce other-crime evidence.

During the trial, the State presented the following evidence. Before defendant went to the party at the home of F.C.'s aunt on August 26, 1988, he borrowed his uncle and housemate, Jorge Marrero's pickup truck for transportation. Defendant and F.C. left the party together at approximately 11:30 p.m. with a pizza that was intended to be delivered to F.C.'s daughter.

When Johnny Lazano, another uncle of defendant, learned on Saturday that F.C. had not returned home, he confronted defendant. When Lazano demanded information about F.C.'s whereabouts, defendant jumped up from the table, saying, "What am I going to do now? What am I going to do now?" Defendant later insisted that he had driven F.C. directly home. Lazano requested that defendant take him to F.C.'s home, but defendant claimed that he forgot where she lived.

Lazano reminded defendant where the victim lived, and the two drove to her home. Defendant told those present that he had dropped F.C. off three doors from her home as she requested. Defendant claimed that he had watched F.C. approach her door. On Saturday, August 27, 1988, Patrolman Frank Buscemi of the Vineland police questioned defendant about the events of the previous night. Defendant told Buscemi he had dropped off F.C. at about 11:00 p.m.

On Sunday, August 28, 1988, Detective Curley and Buscemi questioned defendant at his home. Defendant explained that he had taken F.C. home at about 11:30 p.m. and had then gone to the Peking Restaurant alone. He claimed that he left the restaurant at 1:30 a.m. and drove around Vineland before going home at 4:00 a.m.

Curley and Buscemi questioned Jorge, who told them that when he left for work at 6:30 a.m. on Saturday, neither the truck nor

defendant was at the house. The officers obtained permission from Jorge to search the truck. Buscemi testified that defendant was "literally looking over our shoulders into the truck as we were going through [it]." When inconsistencies began to arise in defendant's alibi, Curley and Buscemi decided to interview defendant at headquarters. Curley noted bruises and swelling on defendant's hands. Defendant claimed the bruises were from working at a carnival, but he later admitted that he had last worked at the carnival more than eighteen months prior to the interview. Defendant stated that he had gone home at 6:00 a.m. on August 27, 1988, and then he changed the time to 7:00 a.m.

When confronted with evidence that F.C. had gone to the Peking Restaurant with him, defendant first denied that she had, but he eventually claimed that he had taken her home at 1:30 a.m. and driven around Vineland and Millville until 7:00 a.m. Defendant claimed that he had neither stopped for gas nor seen anyone during his drive. Defendant could not recall his route, so Curley and Sergeant Ballurio asked him to drive the route while they accompanied him. The trip took between one and one and one-half hours.

Near where F.C.'s body was found, the Vineland police discovered tire tracks running through a patch of vegetation. According to the State's expert, the tire tracks were made by tires similar to those of Jorge's pickup truck, and similar vegetation was stuck in the undercarriage of the pickup truck.

Dr. Lawrence Maypow, the Cumberland County Medical Examiner, conducted an autopsy and concluded that F.C. had died between twenty-four hours and several days before the corpse was discovered. Dr. Maypow concluded that F.C. had died from manual strangulation, based on several bruises on her neck and a fracture of the hyoid bone. A physical assault was evident from a piece of wood lodged in the victim's throat that matched the wood in the bed of Jorge's pickup truck. Semen found on F.C.'s sweater matched that of thirty-six percent of the White male population that included defendant's semen type.

Guy Bishop, another inmate housed in the Cumberland County Jail with defendant, testified that defendant, while in jail awaiting trial, confessed to killing F.C., saying first that she died during consensual· intercourse. Bishop also testified that defendant told him that F.C. had slapped defendant and that he had "grabbed her by the throat and before he realized it she wasn't breathing."

At the time of F.C.'s death, defendant was awaiting sentencing for a sexual assault on another victim. Defendant was charged with raping and sodomizing K.N. in a wooded area of Vineland on March 12–13, 1988. Defendant was also charged with raping and sodomizing another victim, I.F., in a wooded area on March 19–20, 1988. Defendant pled guilty to reduced second-degree sexual assault charges in the K.N. case in exchange for the dismissal of the charges in the I.F. case.

At the close of the State's case, it renewed its motion to introduce the other-crime evidence respecting the K.N. and I.F. sexual assaults, or in the alternative, to introduce the fact that defendant had pled guilty to one of the prior sexual assaults. The State argued that the fact that defendant had pled guilty to a sexual assault and was awaiting sentencing, suggested a motive to kill F.C. and that evidence would assist the jury in determining the type of homicide committed. The trial court denied the State's motion.

The Appellate Division granted the State's motion for leave to appeal on May 25, 1990. Over the dissent of one judge, the Appellate Division summarily reversed by order. The trial court was ordered to admit the fact that defendant was awaiting sentencing for a sexual assault at the time the offenses against F.C. were committed. The trial court was directed to give

an appropriate limiting instruction which shall include the direction that this evidence is not to be considered unless and until the jury finds independently from other evidence in the case, beyond a reasonable doubt, that defendant was in fact the perpetrator of the homicide. Once having so found, the jury may consider the evidence on the issue of defendant's motive and intent in committing the homicide in order to determine the type and degree of homicide involved.

The dissenting member of the panel would have affirmed the trial court's ruling based on *Evidence Rule* 4 balancing test. This Court denied defendant's motion for leave to appeal on May 30, 1990.

The defense case essentially consisted of claiming that everyone connected with the case, including the police officers and Johnny Lazano, had lied in their testimony. Defendant testified in his own defense, and at one point claimed that he would not have committed the murder because he did not want "to do anything to get more time" and that, because "[a]ny [jail] time [is] not pleasant for anybody," he "wasn't going to get in any trouble" after being released on his own recognizance on August 25, 1988, after pleading guilty to the sexual assault on K.N.

The State introduced the other-crime evidence through defendant by agreement after the Appellate Division's ruling. Defendant testified that at the time of F.C.'s murder, he was waiting to be sentenced for the sexual assault on K.N. and that he was released from the Cumberland County Jail the day before the August 26, 1988, murder for which he was on trial.

The defense also presented two experts. The first of those, a dermatologist, testified that the bruises on defendant's hands were not bruises at all, but were rather the result of "acquired acromelanosis" or "hyperpigmentation," a darkening of the skin often seen in darker complexioned people. The expert conceded, however, that the "discoloration" shown in the photographs of defendant's hands could have been caused by punching or beating another person. The second expert testified that he did not find any of defendant's hair on the victim's body or clothing. He admitted on cross examination, however, that he found no hairs or other material originating from a third party either, explaining that a sample's prolonged exposure to the elements greatly reduces the likelihood of recovering any hairs or fibers that may have been transferred onto it.

The trial court dismissed the charge of second-degree sexual assault at the end of the State's case. The jury convicted defen-

dant on all the other charges. He was sentenced to prison for terms aggregating life plus twenty years with forty years of parole ineligibility.

The Appellate Division affirmed the judgment of conviction in an unpublished opinion, with one judge dissenting. The majority of the Appellate Division panel regarded the prior Appellate Division decision to be the law of the case, and therefore, the issue whether the other-crime evidence should have been admitted was not before the court. The dissenting judge found the law-of-the-case doctrine to be a discretionary rule. He concluded that the conviction should be overturned because the probative value of the other-crime evidence was substantially outweighed by the risk of undue prejudice. Thus, the dissents in both appeals were for the same reason: that under *Evidence Rule* 4 balancing test the evidence should have been excluded. This appeal is before the Court based on the two dissents. *R.* 2:2–1(a)(2).

## II

▮ Before dealing with the other-crime-evidence issues, we address a procedural problem related to the two dissents in the Appellate Division. The State relies on the law-of-the-case doctrine, explicated in *State v. Reldan,* 100 *N.J.* 187, 495 *A.*2d 76 (1985), and other cases, to argue that because it relied on the interlocutory decision of the Appellate Division and introduced the other-crime evidence, it would have been unfair to the State for the Appellate Division in the direct appeal to have reversed the admission of other-crime evidence that was based on the order of the first panel.

▮ The applicability of the law-of-the-case doctrine is not affected by the fact that the prior decision was made in an interlocutory appeal as opposed to an appeal after final judgment. *State v. Myers,* 239 *N.J.Super.* 158, 164, 570 *A.*2d 1260 (App.Div.), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990). Similarly, the right to appeal based on a dissent in the Appellate Division does not depend on whether that dissent was filed in an interlocutory

appeal or an appeal after final judgment. If, on the one hand, the Appellate Division's decision in an interlocutory appeal is deemed a final judgment, a dissent creates an automatic right of appeal to this Court pursuant to *Rule* 2:2–1(a)(2). If, on the other hand, the Appellate Division's decision in an interlocutory appeal is not deemed a final judgment, a dissent still creates an automatic right of appeal. The only difference is whether a motion for leave to appeal is required by *Rule* 2:2–2. If leave to appeal based on a dissent is denied, the right to appeal after final judgment is preserved.

In the present case, there is no need for an extended discussion of the law-of-the-case doctrine. This Court's denial of the motion for leave to appeal on May 30, 1990, preserved the issue of whether under *Evidence Rule* 4 balancing test the other-crime evidence was too prejudicial to be amenable to a limiting jury instruction. When this Court denied leave to appeal, an issue framed by the first dissent remained viable in the event the jury convicted defendant of any of the charges. When defendant was convicted on four of the charges, the Appellate Division in the direct appeal declined to entertain defendant's argument that the admission of other-crime evidence had unfairly prejudiced him. That decision was based on the law-of-the-case doctrine. One of the judges on the panel wrote a concurring opinion in which he stated that if he were sitting in the court of last resort, he would entertain the argument. A second member of the panel filed a dissenting opinion in which he concluded that the law-of-the-case doctrine was discretionary. That dissenter conducted a plenary review of the alleged prejudicial effect of the other-crime evidence and found that the prejudice was so substantial that a reversal was required. Thus, the dissents in both the interlocutory appeal and the direct appeal addressed the same issue and reached the same conclusion.

The dissent in the interlocutory appeal entitled defendant to seek review by this Court pursuant to *Rule* 2:2–2. Where irreparable harm cannot be demonstrated in a non-capital case,

unless a broad public policy issue is presented, a denial of leave to appeal by this Court is the rule rather than the exception. *Reldan, supra,* 100 *N.J.* at 205, 495 *A.*2d 76; *In re Uniform Admin. Procedure Rules,* 90 *N.J.* 85, 100, 447 *A.*2d 151 (1982). If this Court denies leave to appeal, once the direct appeal has been concluded, there is an appeal of right pursuant to *Rule* 2:2–1(a)(2) based on a dissent in the interlocutory appeal. The issues and reasons for a dissent, even one entered when the appeal is handled summarily pursuant to *Rule* 2:11–2, should be explained in an opinion for the benefit of the parties and this Court as required by *Rule* 2:11–3(a).

In the present case, the dissent in each of the appeals below is limited to the prejudicial effect of the other-crime evidence. Hence, both dissenters would have affirmed the trial court's exclusion of that evidence. Because both dissents raise the same issue, the appeal of right pursuant to *Rule* 2:2–1(a)(2) makes a discussion of the law-of-the-case doctrine unnecessary to our decision. If the two dissents, however, raised different issues, the doctrine would be inapplicable and the scope of the issues that could be raised in an appeal of right would be framed by the two dissents.

### III

First, we must decide whether the Appellate Division in the interlocutory appeal erred when it overturned the trial court's ruling that the other-crime evidence was inadmissible. If the Appellate Division erred, we must then decide whether the error was harmless which in turn requires us to determine whether the trial court was compelled by *Evidence Rule* 4 to exclude the evidence in the first instance.

### -A-

At the time of defendant's trial, the admissibility of other-crime evidence was controlled by *Evidence Rule* 55. Currently, the

admissibility of other-crime evidence is governed by *N.J.R.E.* 404(b). *Evidence Rule* 55 stated:

Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.

[*Evid. R.* 55.]

*Evidence Rule* 55 makes clear that other-crime evidence is only admissible if relevant to prove some other fact genuinely in issue. *State v. Oliver*, 133 *N.J.* 141, 151, 627 *A.*2d 144 (1993); *State v. Stevens*, 115 *N.J.* 289, 300, 558 *A.*2d 833 (1989). Where the other-crime evidence tends to make the existence of a material fact reasonably likely, it is admissible subject to the "probativeness/prejudice" balancing under *Evidence Rule* 4, now *N.J.R.E.* 403.

In addition to being relevant to an issue genuinely in dispute, the other-crime evidence must "be necessary for [the disputed issue's] proof." *Stevens, supra,* 115 *N.J.* at 301, 558 *A.*2d 833. Because of its damaging nature, in determining the probative worth of other-crime evidence, "a court should consider ... whether its proffered use in the case can adequately be served by other evidence." *Id.* at 303, 558 *A.*2d 833; *see also Oliver, supra,* 133 *N.J.* at 151, 627 *A.*2d 144 (stating that "[a]n important factor in weighing the probative value of other-crime evidence is whether other, less-inflammatory evidence can prove the same fact in issue").

Once it is determined that the other-crime evidence is material to a fact genuinely in issue and that the other-crime evidence is necessary, "the probative value of the proffered evidence [must] be carefully balanced against the danger that it will create undue prejudice against the defendant." *Stevens, supra,* 115 *N.J.* at 302, 558 *A.*2d 833. Where the probative value is outweighed by prejudice to the defendant, then it is inadmissible. *Evid. R.* 4 (currently *N.J.R.E.* 403). Consequently, the primary

focus of *Evidence Rule* 55, when examined in conjunction with *Evidence Rule* 4, is to view it as a rule of exclusion rather than a rule of inclusion. *State v. Cofield,* 127 *N.J.* 328, 337–38, 605 *A.2d* 230 (1992).

After many years of decisional law determining when other-crime evidence is admissible, a four-part test has been distilled. That test is designed to "avoid the over-use of extrinsic evidence of other crimes or wrongs." *Id.* at 338, 605 *A.2d* 230. That rule is as follows:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Ibid.* (quoting Abraham P. Ordover, *Balancing the Presumptions Of Guilt and Innocence: Rules 404(b), 608(b), And 609(a),* 38 *Emory L.J.* 135, 160 (1989)).]

Determinations on the admissibility of other-crime evidence are left to the discretion of the trial court: "The trial court, because of its intimate knowledge of the case, is in the best position to engage in this balancing process. Its decisions are entitled to deference and are to be reviewed under an abuse of discretion standard." *State v. Ramseur,* 106 *N.J.* 123, 266, 524 *A.2d* 188 (1987); *see also State v. DiFrisco,* 137 *N.J.* 434, 496, 645 *A.2d* 734 (1994) (noting that "[w]e accord trial judges broad discretion in applying the balancing test"), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L. Ed.2d* 873 (1996); *State v. Atkins,* 78 *N.J.* 454, 462, 396 *A.2d* 1122 (1979) (refusing to reverse admission of prior conviction where trial judge balanced probative value against potential for prejudice and noting that "particularly in view of his feel of the case, we do not find [that the trial judge's] judgment constituted an abuse of the discretion vested in him"); *State v. Sands,* 76 *N.J.* 127, 144, 386 *A.2d* 378 (1978). Only where there is a "clear error of judgment" should the "trial court's conclusion with respect to that balancing test" be disturbed. *DiFrisco, supra,* 137 *N.J.* at 496–97, 645 *A.2d* 734; *see also State*

*v. Koedatich,* 112 *N.J.* 225, 313, 548 *A.*2d 939 (1988) (noting that "[a] trial court's ruling will not be upset unless there has been an abuse of that discretion, *i.e.,* there has been a clear error of judgment"), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989).

The primary focus in this case, both at the trial and appellate levels, is on the first and fourth prongs of the *Cofield* test: whether the other-crime evidence was relevant to a material issue in the case and whether the probative value of that evidence outweighed its prejudicial effect.

■ We agree with defendant that the Appellate Division erred when it overturned the trial court's decision not to admit the other-crime evidence. The trial court made a discretionary determination to exclude the other-crime evidence under *Evidence Rule* 4. Its decision was entitled to deference absent a showing of an abuse of discretion, *i.e.,* there has been a clear error of judgment. *DiFrisco, supra,* 137 *N.J.* at 496–97, 645 *A.*2d 734; *Koedatich, supra,* 112 *N.J.* at 313, 548 *A.*2d 939. Rather than reviewing the trial court's determination under an abuse of discretion standard, *Ramseur, supra,* 106 *N.J.* at 266, 524 *A.*2d 188, the Appellate Division substituted its judgment for that of the trial court without a discussion of the deferential standard of review. It did not find that the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted." *State v. Kelly,* 97 *N.J.* 178, 216, 478 *A.*2d 364 (1984).

-B-

■ Because the Appellate Division erred in reversing the trial court's ruling, we must now determine whether the introduction of the other-crime evidence was harmless error.

The State argues that the evidence of defendant's guilty plea was relevant because it tended to show intent and motive. The State argues that the fact defendant had pled guilty to sexual assault and was awaiting sentencing suggests a motive for killing

the victim. It was the State's theory that defendant killed the
victim after sexually assaulting her in order to avoid an enhanced
prison term on his pending sentencing for sexual assault and to
avoid further prosecution for yet another sexual assault. The
State further contends that the testimony of Guy Bishop stating
that defendant told him that he was having consensual sex with
the victim when she slapped him and that he responded by
grabbing "her by the throat and before he realized it she wasn't
breathing," raises a question for the jury's determination of
whether the homicide was purposeful or knowing murder, aggra-
vated manslaughter, reckless manslaughter, passion-provocation
manslaughter, or felony murder. The other-crime evidence, ac-
cording to the State, assisted the jury in determining motive and
intent in order to determine the degree of the homicide.

Furthermore, notwithstanding the fact that the defense at trial
was a general denial of guilt, the testimony of Guy Bishop
compelled the trial court to require the jury to consider whether
the victim's death occurred during consensual sexual intercourse
and whether the killing was accidental or intentional. The
charges against defendant included first and second-degree sexual
assaults. "When a defendant claims that he penetrated with
permission, he puts his own state of mind in issue: he argues that
he reasonably believed that the alleged victim had affirmatively
and freely given him permission to penetrate. The State, there-
fore, can introduce evidence to disprove that the defendant had
that state of mind." *Oliver, supra,* 133 *N.J.* at 155, 627 *A.*2d 144.
Thus, defendant's state of mind was a relevant issue respecting
the sexual assaults and the death of F.C., and the other-crime
evidence was probative of those issues notwithstanding the fact
that the trial court's jury instructions prohibited the jury from
using the other-crime evidence with respect to the assaults.

The other-crime evidence was also relevant to defendant's mo-
tive for the killing: to silence F.C. to prevent her from filing a
sexual assault charge thereby causing a revocation of defendant's
bail status pending sentencing on the K.N. sexual assault. A

second sexual assault charge would also enhance the possibility of a more severe sentence for the K.N. sexual assault. Viewed in that context, the other-crime evidence was offered to establish issues in the case such as motive and intent that were genuinely in dispute. The other-crime evidence was also necessary because the other evidence bearing on defendant's state of mind, such as that presented by Bishop, had been severely attacked during cross-examination.

In the past, the Court has found other-crime evidence to be probative of intent and motive. In *State v. Erazo*, 126 *N.J.* 112, 594 *A.*2d 232 (1991), the State introduced evidence showing that the defendant had been convicted of murder to support its argument that the defendant had killed the victim to prevent her from causing a revocation of his parole. *Erazo, supra,* 126 *N.J.* at 130–31, 594 *A.*2d .232. The Court held that the other-crime evidence was properly admitted because it was "necessary to prove the State's theory of defendant's motive." *Id.* at 131, 594 *A.*2d 232.

The Court reached the same conclusion in *State v. Baldwin,* 47 *N.J.* 379, 221 *A.*2d 199, *cert. denied,* 385 *U.S.* 980, 87 *S.Ct.* 527, 17 *L. Ed.*2d 442 (1966). There, the defendant was accused of killing a man who was to have been a prime witness against him in a prosecution for robbery. *Baldwin, supra,* 47 *N.J.* at 391, 221 *A.*2d 199. The State introduced statements made by the victim in which he indicated his intent to testify against the defendant. *Ibid.* The Court held that the evidence was properly admitted as evidence of motive. The Court stated:

> Here the emphasis was not upon defendant's guilt of [the robbery], but rather upon the prospect that [the witness-victim] would be the instrument of defendant's conviction of it. To that end, it was proper to show [the witness-victim's] intent to testify and that defendant knew it. Statements made by the deceased of his intent to be a witness for the State were directly probative of that state of mind.
>
> [*Ibid.*]

Similarly, our courts have allowed the admission of other-crime evidence to establish intent. The most relevant cases are *State v. Mulero,* 51 *N.J.* 224, 238 *A.*2d 682 (1968), and *State v. Cusick,* 219 *N.J.Super.* 452, 530 *A.*2d 806 (App.Div.), *certif. denied,* 109 *N.J.*

54, 532 *A.*2d 1118 (1987). In *Mulero,* the defendant was accused of beating to death the daughter of his paramour. *Mulero, supra,* 51 *N.J.* at 226–27, 238 *A.*2d 682. He admitted that he had struck the victim, but denied having killed her. *Id.* at 227–28, 238 *A.*2d 682. The paramour testified that the defendant had beaten her on previous occasions. *Ibid.* The Court held that admission of the testimony was proper because it was probative of the defendant's intent with regard to his striking the victim.

The Appellate Division reached the same conclusion in *Cusick,* where the defendant was accused of sexually assaulting a child. *Cusick, supra,* 219 *N.J.Super.* at 454, 530 *A.*2d 806. The trial court permitted, over the defendant's objection, testimony by the victim and another child concerning prior acts of sexual assault for which the defendant had been convicted in a separate proceeding. *Id.* at 464, 530 *A.*2d 806. The Appellate Division affirmed, finding that the evidence was admissible to show lack of mistake and intent. On the intent issue, the court noted:

> Extremely probative of whether defendant's acts were done for purposes of sexual arousement or gratification was the evidence that defendant had previously pleaded guilty to having sexually assaulted young girls. This fact supported the inference that defendant enjoyed or was stimulated by sexual acts with young girls and was therefore relevant to whether or not defendant was guilty of sexual contact.
>
> [*Id.* at 465–66, 530 *A.*2d 806.]

Two other jurisdictions have permitted the admission of other-crime evidence to show motive and intent in cases with fact patterns virtually identical to that of the instant case. Those are *North Carolina v. Moseley,* 338 *N.C.* 1, 449 *S.E.*2d 412 (1994), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1815, 131 *L. Ed.*2d 738 (1995), and *Pennsylvania v. Billa,* 521 *Pa.* 168, 555 *A.*2d 835 (1989).

In *Moseley,* the defendant was convicted and sentenced to death for the sexual assault and murder of Dorothy Johnson. *Moseley, supra,* 449 *S.E.*2d at 421. The defendant had been seen talking and dancing with the victim at a nightclub on the day of her killing. *Ibid.* The victim's naked body was found the next day in a rural area. *Ibid.* "She had been savagely beaten with a blunt force object, cut with a sharp object, sexually assaulted with a

blunt instrument, raped, and manually and ligaturally strangled."
*Ibid.*

The trial court permitted the testimony of Denise Fletcher,
whom the defendant had sexually assaulted two years earlier. *Id.*
at 438. She testified that, on the day in question, the defendant
picked her up in his vehicle and drove her to a secluded spot
where the pair engaged in consensual kissing. *Ibid.* When the
defendant started to fondle Fletcher, she told him to stop, but he
instead brandished a gun, and ordered her to undress and to
perform fellatio on him. *Ibid.* When she resisted, a struggle
ensued, the gun discharged, and Fletcher was slightly wounded.
*Ibid.* Although he told her that he "knew she would tell the
authorities about him and that he would get in trouble," he then
drove her home. *Ibid.*

The North Carolina Supreme Court held that it was proper to
admit evidence of assault on Fletcher during the Johnson murder
trial. *Id.* at 438–39. Although noting the many dissimilarities
between the two assaults, it found that the "evidence contained
sufficient similarities to the crimes charged to support a reason-
able inference that the same person committed both acts." *Id.* at
439. In discussing the probative value of the evidence to show
motive, the Court stated:

> In the case *sub judice,* the testimony of Ms. Fletcher was properly offered to show
> defendant's motive for killing Ms. Johnson: From his experience with Ms. Fletch-
> er, defendant knew that his crime would be reported to law enforcement authori-
> ties and that he would suffer the consequences if he left his victim alive.
>
> [*Ibid.*]

In *Billa,* the defendant was convicted of murdering Maria
Rodriguez and sentenced to death. *Billa, supra,* 555 A.2d at 837.
The victim was found in the basement of her house after she had
been raped and stabbed eight times. *Ibid.* The State produced
Florence Morales, who testified that two months prior to the
murder, the defendant had taken her to a vacant lot against her
will, tried to force her to perform oral sex on him, and then raped
her. *Id.* at 838. She said that he then told her that "he could not
let her go because she would go to the police," and he then

"strangled her until she lost consciousness." *Ibid.* The defendant testified in his own defense, claiming that the stabbing had been accidental. *Ibid.* The Pennsylvania Supreme Court held that the testimony was properly admitted: "We agree with the Commonwealth that the evidence of the sexual assault on his prior victim was, under the circumstances, relevant and of significant evidentiary value to proving appellant's motive, [which was to prevent her from reporting him to the police], intent and the absence of accident in the murder and other crimes against his second victim." *Id.* at 841.

In *Moseley* and *Billa,* both courts accepted the argument that the State advances here—that the fact that a person had committed a sexual assault in the past is probative of his motive to kill his latest victim to prevent defendant from receiving an enhanced sentence. *See Moseley, supra,* 449 S.E.2d at 439; *Billa, supra,* 555 A.2d at 839. Further support for that proposition can be found in three other cases in which the respective court found the other-crime evidence to be admissible. Those are *United States v. Menzer,* 29 F.3d 1223 (7th Cir.), *cert. denied,* 513 U.S. 1002, 115 S.Ct. 515, 130 L. Ed.2d 422 (1994); *New Mexico v. Clark,* 108 N.M. 288, 772 P.2d 322, *cert. denied,* 493 U.S. 923, 110 S.Ct. 291, 107 L. Ed.2d 271 (1989); and *California v. Heishman,* 45 Cal.3d 147, 246 Cal.Rptr. 673, 753 P.2d 629, *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L. Ed.2d 369 (1988).

We conclude that the other-crime evidence was material to prove motive and intent that were genuinely in dispute. Defendant could have been motivated to kill F.C. to prevent her from filing new charges against him, thereby causing a revocation of his bail status. A second sexual assault charge would also enhance his chances of receiving a greater sentence for the sexual assault on K.N. In addition, the other-crime evidence was relevant to refute defendant's statement to Guy Bishop that he did not intend to kill F.C. Finally, there was no other evidence available to the State to establish motive and intent. Unlike some cases, the physical evidence revealed by the autopsy was less than conclusive

.

with regard to defendant's motive or intent for committing the homicide. Consequently, the first prong of the *Cofield* test was satisfied. However, that means that only the probative aspect of the probative-prejudicial balancing test has been satisfied so far.

-C-

Defendant claims that irrespective of the relevance and probative worth of the motive and intent evidence, it should have been excluded because of its prejudicial impact. The dissent agrees with that assertion.

This is a case in which reasonable minds can and did differ about the *Rule* 55 decision to admit other-crime evidence based on the probative-prejudicial balancing test. At least two judges in the Appellate Division and five members of this Court have disagreed with the trial court's decision that the prejudicial effect of that evidence required exclusion.

▮ Although this Court has imposed a high standard for the admission of other-crime evidence because of its potentiality to cause unfair prejudice, it has not excluded all other-crime evidence. A decision to admit such evidence should not be upset unless "the danger of undue prejudice ... outweigh[s] probative value so as to divert jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence." *State v. Moore*, 122 *N.J.* 420, 467, 585 *A.*2d 864 (1991); *see also State v. Wilson*, 135 *N.J.* 4, 20, 637 *A.*2d 1237 (1994) (noting that trial court's discretion in this area is "broad").

In *Erazo*, a capital case, this Court found that the introduction of evidence of a prior eleven-year-old homicide to establish motive and intent was not too prejudicial. *Erazo, supra*, 126 *N.J.* at 130, 594 *A.*2d 232.

In *Cusick*, the defendant was on trial for aggravated sexual assault and sexual assault upon an eight-year-old female. *Cusick, supra*, 219 *N.J.Super.* at 454, 530 *A.*2d 806. Other-crime evidence from three six-year-old female children that defendant had sexual-

ly assaulted them was admitted to establish motive, intent, and the absence of mistake. *Id.* at 464, 530 *A.*2d 806. The court found that the probative value of the evidence outweighed its prejudicial effect. *Id.* at 464–65, 530 *A.*2d 806.

The other-crime evidence in this case consisted of testimony that defendant pled guilty to sexual assault upon K.N., that he was released from jail the day before F.C.'s murder, and that he was waiting to be sentenced on the K.N. sexual assault at the time of F.C.'s murder. Neither the details of K.N.'s sexual assault, nor any victim impact statements, were placed before the jury except for the fact that the jury was informed that the K.N. offense predated the F.C. murder by five months. Whether the probative worth of such evidence was outweighed by its prejudicial effect on defendant must be pragmatically evaluated in the context in which that evidence was offered. *Stevens, supra,* 115 *N.J.* at 303, 558 *A.*2d 833.

The temporal remoteness of other-crime evidence affects both its probative worth and prejudicial effect on a defendant. In the present case, the fact that defendant was waiting to be sentenced on the five-month-old sexual assault satisfied the second prong of the *Cofield* test: that the other-crime evidence must be "similar in kind and reasonably close in time to the offense charged." *Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230. In addition, because the assault on K.N. and defendant's guilty plea were so recent, he had not been sentenced for that sexual assault. Consequently, his criminal conduct before that sentencing had substantial probative worth because it could have an impact on the severity of the sentence within the range of sentencing discretion permitted by the plea agreement. Given the obligation imposed upon the State to prove defendant's state of mind, the other-crime evidence was "inextricably entwined with the material facts." *State v. West,* 29 *N.J.* 327, 335, 149 *A.*2d 217 (1959). Indeed, this Court has recognized that "evidence as to motive [of a criminal defendant] is admissible even though it may be prejudicial in the sense that it

will arouse or inflame the jury against the defendant." *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982).

Many times the delicate balancing of the probative worth of other-crime evidence against its prejudicial impact can be tipped in favor of exclusion based on anticipated misuse of that evidence by a prosecutor during summation. In this case, rather than arguing propensity to the jury, the prosecutor argued that the defendant's motive for killing F.C. was to silence her.

> If he didn't silence her, he was going to be put in jail right away and he was going to get more time. He had just pled guilty to a sexual assault, a rape ... on August 25, 1988. He had been released ... on his own recognizance ... [and] if he had let her live, she would go to the police and what that would mean is that he would go back in jail, and he would get more time than what he had been told [at the plea hearing] he would get ... [because of the] second sexual assault.

Our pragmatic evaluation of the other-crime evidence in the context in which it was offered leads us to conclude that the probative value of that evidence outweighed any prejudicial effect on defendant. That conclusion is strengthened by the fact that the trial court instructed the jury not to consider the other-crime evidence for any purpose until after the jury had concluded from other evidence that defendant perpetrated the homicide.

## -D-

We are also satisfied that the admission of other-crime evidence over the trial court's discretionary decision to exclude it was harmless error. Although a trial court's ruling concerning *Rule* 55 evidence is entitled to deference, that ruling does not preclude appellate review. The Appellate Division in the interlocutory appeal found that the trial court had abused its discretion in excluding the other-crime evidence. This Court has made a similar determination in the past. In *State v. Balthrop,* 92 *N.J.* 542, 546, 457 *A.*2d 1152 (1983), based on its appraisal of the record, the Court held that the trial court had "mistakenly exercised its discretion in excluding the [other-crime] evidence." *Ibid.* Under the harmless error analysis, any prejudice to defendant was not such that created a real possibility that the jury arrived at a result

it otherwise might not have reached. *State v. Macon*, 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971). Unlike the dissent, we have no reasonable doubt whether the other-crime evidence diverted jurors from a reasonable and fair evaluation of defendant's guilt or innocence. *Moore, supra,* 122 *N.J.* at 467, 585 *A.*2d 864.

## IV

The final issue to be decided is whether the trial court's jury instructions limiting the use of the other-crime evidence were adequate.

The jury was instructed as follows:

Evidence also can be admitted for limited purposes, ladies and gentleman. In other words, it can be admitted as evidence tending to prove certain facts in issue but for no other facts, and we have evidence like that in this particular case, I want to deal with it at this point.

You'll recall, ladies and gentlemen, that there was some testimony presented to you that indicated that at the time this offense is alleged to have happened, the defendant was awaiting sentence after a plea of guilty on a charge of sexual assault. Now, that testimony and that evidence could only be used by you for a limited purpose, and I will explain that to you. It cannot be used on any of the charges that have been presented by the State with the exception of the homicide charge. And with reference and that means that it can't be considered by you in connection with any of those other charges. In addition to that, your consideration of that evidence in reference to the homicide charge, the Court is instructing you is to be used on a limited basis and that is as follows:

It cannot be used by you even on the homicide charge for any purpose unless and until you have found independently from all of the other evidence in the case beyond a reasonable doubt that the defendant was, in fact, the perpetrator of the homicide that's alleged by the State. In other words, you can use that evidence for no purpose until such time as you have determined from all of the other evidence, if you do so determine that the defendant is, in fact the one who caused the death of [F.C.]. If, in fact, you have determined that beyond a reasonable doubt, then you may consider the evidence that was presented with reference to the defendant's plea and his awaiting sentence on sexual assault on the issue of the defendant's motive and his intent in committing the homicide in order to determine the type and degree of the homicide.

So that, ladies and gentlemen, my instructions to you are that you may not use that evidence in your considerations for any purpose in connection with your considerations of the charges of kidnapping or aggravated sexual assault and that you may only use that evidence after your consideration of all of the other evidence and your determination based upon that other evidence that the State has proven beyond a reasonable doubt, that the defendant is the one who caused the death of

[the victim]. At that point, you may then use that evidence to determine the motive or intent of the defendant if it helps you to do so.

Interestingly, the same defense attorney who represented defendant throughout the trial and participated in both the State's application to admit the other-crime evidence and the interlocutory appeal, did not object to the jury charge. The same attorney represented defendant in his direct appeal to the Appellate Division where no claim was made that the jury charge was inadequate. Nor did either of the dissents raise the issue of the adequacy of the jury instructions. The issue is raised for the first time before this Court. Because defendant's appeal is before the Court based on the two dissents, the issues are limited to those framed by the dissent. *R.* 2:2–1(a)(2). Technically, the issue of the adequacy of the limiting instruction is not before us. However, because we have found that the Appellate Division made a harmless error when it reversed the trial court's decision not to admit the other-crime evidence, we are constrained to consider the adequacy of the limiting instruction as part of our harmless error analysis.

Defendant contends that the instruction was flawed in three respects: (1) it failed to explain the "abstract issues [of intent and motive] in context or illustrate[ ] to the jury *how* it could apply the other crime evidence to those issues for which the evidence had been admitted"; (2) it failed to "relate the limited instruction to the subsequent instructions respecting the types and degrees of homicide"; and (3) it failed to "inform the jurors that they were *not* to use the evidence of prior sexual assault to determine that defendant was a bad person, or to determine that he had been disposed to commit the crimes charged in the indictment." We will examine those contentions under the plain-error rule. *Rule* 2:10–2 provides that any error not "clearly capable of producing an unjust result" shall be disregarded. Under that standard the issue becomes whether the instruction created a possibility of injustice, defined to mean "one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *Macon, supra,* 57 *N.J.* at 336, 273 *A.*2d

1. We conclude that the jury instructions, considered as a whole, do not rise to the level of being "clearly capable of producing an unjust result." *R.* 2:10–2.

When other-crime evidence is admitted, "the court must instruct the jury on the limited use of the evidence." *Cofield, supra,* 127 *N.J.* at 340–41, 605 *A.*2d 230; *see also Stevens, supra,* 115 *N.J.* at 304, 558 *A.*2d 833. Because of the inherently prejudicial nature of other-crime evidence, the court's instruction " 'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.' " *Cofield, supra,* 127 *N.J.* at 341, 605 *A.*2d 230 (quoting *Stevens, supra,* 115 *N.J.* at 304, 558 *A.*2d 833).

This case falls between the sufficient instruction in *Cusick, supra,* 219 *N.J.Super.* at 466, 530 *A.*2d 806, and the deficient instruction in *Oliver, supra,* 133 *N.J.* at 157, 627 *A.*2d 144. Here, the trial court did not merely state that the evidence could be used in connection with the issues of intent, motive, or absence of an accidental killing. Rather, the trial court explained to the jury how the other-crime evidence could not be used and how it could be used, as required by *Oliver* and *Stevens.* The trial court told the jury that it was not to consider the other-crime evidence until it had found independently from the other evidence that defendant committed the homicide. The trial court then explained, "[a]t that point, you may then use that evidence to determine the motive or intent of the defendant" in committing the homicide in order to determine the type and degree of the homicide. The court told the jury that the other-crime evidence could not be used for any other purpose, including "kidnapping or aggravated sexual assault."

Unlike the instructions in *Oliver* and *Stevens,* the trial court did not specifically tell the jury that it could not use the other-crime evidence to conclude that defendant was a bad person or that he had the propensity to be a rapist. This omission is clearly in

contradiction to this Court's conclusion that the anti-propensity instruction is an essential point to be made in the limiting instruction. *Stevens, supra,* 115 *N.J.* at 309, 558 *A.*2d 833.

Nonetheless, the trial court's instruction not to use the other-crime evidence for any other purpose except for motive and intent on the homicide charge implicitly told the jury not to use the other-crime evidence for propensity. The evidence could not be used before the jury found defendant guilty of the homicide beyond a reasonable doubt based on evidence *independent* of the other-crime evidence even though the evidence was admitted to show motive and intent.

In addition, the evidence of guilt, independent of the other-crime evidence, was nearly overwhelming. Defendant was seen leaving the party with F.C. and later seen with her at a bar. Defendant admitted to his friend, Guy Bishop, who also was an inmate at the time defendant was in jail, that he had sex with F.C. and that he killed her. An FBI Special Agent concluded that the tires on the pickup truck defendant drove that evening created a "similar" groove pattern to those at the murder scene. The same type of vegetation that was growing near where the body was discovered was found protruding from the undercarriage of the truck. Wood that was in the bed of the truck was found to be very similar to the wood in the victim's throat. Defendant was determined to be a possible source of the semen found on the victim's sweater.

On the one hand, courts are generally reluctant "to reverse on the grounds of plain error when no objection to a charge has been made." *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987). On the other hand, " 'incorrect instructions of law are poor candidates for rehabilitation under the harmless error theory.' " *State v. Wilson,* 128 *N.J.* 233, 241, 607 *A.*2d 1289 (1992) (quoting *Weeks, supra,* 107 *N.J.* at 410, 526 *A.*2d 1077). Here, however, the problem is an incomplete instruction rather than an affirmative misstatement of the law.

In *State v. Hunt,* 115 *N.J.* 330, 558 *A.*2d 1259 (1989), this Court found that the failure to give a limiting instruction on the proper use of other-crime evidence was harmless error. *Hunt, supra,* 115 *N.J.* at 363–64, 558 *A.*2d 1259. More recently, this Court concluded that after conducting a fact-specific inquiry "to determine whether prejudice has resulted from the failure to give a sufficiently limiting instruction governing the use of other-crime evidence," *State v. G.S.,* 145 *N.J.* 460, 473, 678 *A.*2d 1092 (1996), a court may conclude that an inadequate limiting instruction did not "tip[ ] the jury's deliberations in favor of a non-guilty verdict." *Id.* at 476, 678 *A.*2d 1092. The strength of the evidence against a defendant, independent of the other-crime evidence, is a factor to be considered in determining prejudice to a defendant. *Id.* at 475, 678 *A.*2d 1092.

Our fact-specific inquiry in the present case, and consideration of the near overwhelming evidence of guilt independent of the other-crime evidence, convince us that the failure of the trial court to give a sufficiently limiting instruction governing the use of the other-crime evidence was not "clearly capable of producing an unjust result." *Cofield, supra,* 127 *N.J.* at 341, 605 *A.*2d 230. It did not tip the scales in the jury's deliberations.

Accordingly, the judgment of the Appellate Division is affirmed.

O'HERN, J., concurring.

I concur in the judgment of the Court for reasons different from those stated by the majority. The majority reasons that the Appellate Division erred in substituting its judgment for that of the trial court on its discretionary ruling concerning the admission of other-crimes evidence but that the error was harmless. I cannot agree that the conviction can be salvaged under harmless-error analysis. To say that the Appellate Division erred in reversing the trial court is to say that the evidence of other crimes should not have come in. If the evidence should not have come in, the admission of the evidence in this case could not have been harmless.

> The [harmless error] rule is essential "to conserve judicial resources," but it must be applied with caution so as to assure "the vitality of the rules and procedures designed to assure a fair trial."
>
> . . . .
>
> . . . .
>
> There is enormous potential for prejudice in the improper admission of a defendant's prior convictions. Commentators have suggested that such error should be considered harmful *per se.* See *The Riddle of Harmless Error* [1970], where Chief Justice Traynor wrote:
>
> The *erroneous* admission of evidence of other crimes also carries such a high risk of prejudice *as ordinarily to call for reversal.*
>
> . . . .
>
> Prior convictions tend to have an incalculably potent impact on the minds of jurors, both because they are evidence of the defendant's criminal proclivities and therefore of the likelihood that he is guilty as charged, and because they can prejudice the jury against the defendant and lead them to convict him as a "bad man" regardless of the weight of evidence.
>
> [*State v. Atkins,* 151 *N.J.Super.* 555, 570, 377 *A.*2d 718 (App.Div.1977), *rev'd primarily on issue of intoxication charge and that evidence of burglary was "undisputed,"* 78 *N.J.* 454, 396 *A.*2d 1122 (1979) (internal citations omitted) (emphasis added in original).]

Because the evidence of the rape was so strongly disputed, this conviction cannot be salvaged under traditional harmless-error doctrine if it was wrong to have admitted the evidence.

I believe that we should affirm the judgment of conviction in a candid recognition that under our rules governing interlocutory relief, the Appellate Division was in effect sitting as a trial court determining the admissibility of evidence. In our post-trial review of such a matter, we should defer to the discretionary rulings of the Appellate Division on the admissibility of evidence as though it were sitting as a trial court. We otherwise produce an intolerable system of justice under which jurors and parties participate in a trial in which deference may not be given to the evidentiary rulings under which the trial was conducted. The inverted question on appeal becomes whether the intermediate level court should have deferred to the trial court, not whether the discretion-

ary . rulings under which the trial court took place would not constitute an abuse of the discretion to admit evidence.

This is a case in which reasonable minds might differ about the *Rule* 404 decision to admit the other-crimes evidence. In balancing the probative worth of the evidence against its prejudicial effect, the Appellate Division reached a different balance than did the trial court. The Appellate Division having established the ground rules for this trial, we should defer to its ruling.

HANDLER, J., dissenting.

Defendant was indicted for murder, felony murder, first-degree kidnapping, first-degree aggravated sexual assault, and second-degree sexual assault. The prosecution's theory of the case was that defendant took his victim to a secluded area, raped her, and then intentionally killed her. The theory that the killing was intentional was based on the supposition that because defendant had committed prior sexual offenses, he believed that it was necessary to kill his victim in order to escape detection for his crime. Thus, prior to the commencement of trial, the prosecution moved to introduce evidence that defendant was awaiting sentencing on a prior sexual assault to which he had pled guilty in order to demonstrate that defendant intended to kill the victim.[1] The trial court reserved decision. At the close of the prosecution's case, the court denied the motion. The Appellate Division granted the prosecution's motion for leave to appeal this ruling and, over the dissent of one judge, ordered the admission of the other-crimes evidence that the trial court excluded. This Court denied defendant's motion for leave to appeal the appellate order, and the evidence was subsequently admitted during examination of the defendant. Defendant was convicted of murder, felony murder, first-degree kidnapping, and first-degree aggravated assault by a jury.

---

[1] Defendant had actually been charged in two separate prior sexual assault incidents, but pled guilty to one in exchange for which the prosecutor agreed to drop all charges related to the other incident.

The majority concedes, as it must, that it was error for the appellate court to order the admission of this highly inflammatory evidence. The majority then concedes, as it also must, that the portion of the jury instruction related to this very evidence—*prior sexual assaults in a prosecution for sexual assault and murder*—failed to satisfy the demands of our prior decisions. Despite these two concessions of error, the majority still manages to conclude that this defendant was provided the fair trial to which he is entitled. To reach its seemingly predetermined outcome, the majority employs a seriously flawed harmless-error analysis.

## I

This Court has carefully and extensively developed the standards that govern the admissibility and use of other-crimes evidence in criminal prosecutions. In *State v. Cofield,* 127 *N.J.* 328, 605 *A.*2d 230 (1992), we synthesized the principles of the two relevant evidentiary rules, now *N.J.R.E.* 403 and *N.J.R.E.* 404 (formerly *Evid. R.* 4 and *Evid. R.* 55, respectively), into a four-part standard of admissibility:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230.]

The majority correctly identifies that the first and fourth prongs of the formulation are at issue in this case. However, the majority inappropriately concentrates its harmless-error analysis on the first prong. Seemingly only as an after-thought and with scant attention does it turn to the fourth prong; yet that prong was the trial court's actual reason for exclusion and is the crux of this case—that "admission [of the other crimes evidence] would be so prejudicial that the jury could not possibly follow the court's instructions...."

In this case, the trial court conceded that evidence regarding the prior sexual offenses may be relevant to demonstrate that the defendant had a motive to kill his victim. At the pre-trial evidentiary hearing on this issue, the prosecution presented four witnesses in support of its position that the other-crimes evidence was admissible at trial: K.N. (allegedly victimized by defendant on March 12, 1988) and State Trooper Andrew Lopez (the trooper who investigated the incident), I.F. (allegedly victimized by defendant on March 19, 1988) and Vineland Police Officer Benny Velez (the officer who investigated this incident). After presenting the testimony of those four witnesses, the prosecution argued that the other-crimes evidence was admissible to prove motive, intent, state of mind, identity, and absence of mistake. The prosecution's primary argument, however, was that the prior crimes were admissible to demonstrate that defendant had a motive to kill: to silence his victim and thereby avoid a return to prison. The court denied the motion, but reserved decision as to whether the evidence could be admitted to demonstrate that defendant had a motive to kill the victim.[2]

At the conclusion of its case, the prosecution renewed the motion to admit the other-crimes evidence. After having heard the testimony of thirty-eight witnesses over the course of five days of trial, the court concluded that:

I'm going to deny [the motion]. I don't think that I'm going to allow it in. It may be admissible superficially on the basis of Rule 55, but because of the type of trial we're involved in and the charges, that I think to admit them for the limited purposes under Rule 55 would be so prejudicial that the court is going to deny your motion.

In response to the protest of the prosecution, the court elaborated that:

I remember your argument.... I remember it very clearly, and although I reserved decision on it at that time to see what the State presented to support the sexual assault charge in the matter, I've reflected on it. I have concluded that in

---

[2] The court also left open the possibility that the other crimes evidence might be relevant to demonstrate intent to commit the charged offense of aggravated sexual assault.

this case, because of the circumstances, the admission of prior sexual assault convictions even for Rule 55 purposes while it may satisfy the requirements generally of Rule 55—and I'm not so sure that it does—but that it may, by the same token, the court feels that because of the charges in this matter, that admission would be so prejudicial that the jury could not possibly follow the court's instructions that it could reasonably be used for a very limited purpose. Therefore, the court is not going to let it in.

It is clear that the court excluded the other-crimes evidence on the ground that any probative value was outweighed by its potential to prejudice the jury against the defendant. The trial court never wavered from its determination that the other-crimes evidence would be overwhelmingly prejudicial. After the Appellate Division reversed its exclusionary ruling, the trial court reiterated and reemphasized its ground for exclusion:

I think the prejudice is just so great that it should not come in. So what's going to come in is ... the fact that he was awaiting sentence on a sexual assault, that the period of time that he was in jail just prior to this incident, and the fact that he pled guilty to it.

The majority correctly recognizes that it was error for the appellate court to have ordered the admission of the other-crimes evidence after the trial court so deliberatively concluded it should not be admitted. *Ante* at 483, 691 *A.*2d at 300. The trial court's decision was entitled to respect, not because the evidence was without logical relevance, but because the trial court had engaged in the kind of contextual evaluation of the prejudicial impact of that evidence that warrants deference and ratification by an appellate court. As we have said previously, "th[e] inflammatory characteristic of other-crime evidence ... mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." *State v. Stevens*, 115 *N.J.* 289, 303, 558 *A.*2d 833 (1989). Thus, when "reasonable minds can and [do] differ about the *R.* 55 decision to admit other-crime evidence based on the probative-prejudicial balancing test," *ante* at 490, 691 *A.*2d at 303, these fundamental principles of evidence law require that the trial court decision take precedence.

The majority seeks to salvage the patently mistaken ruling by the Appellate Division. It purports to succeed in its mission by embarking on a harmless-error analysis of a sort totally foreign to this Court's jurisprudence. In an extraordinary effort to preserve this conviction, it feigns indifference to the internal inconsistencies in its own analysis. The majority cannot logically concede that the Appellate Division erred when it ordered the admission of this evidence, *ante* at 484, 69 *A*.2d at 300 ("We agree with defendant that the Appellate Division erred when it overturned the trial court's decision not to admit the other-crime evidence"), and then rely on that erroneous order as support for its result. *See Ante* at 493, 691 *A*.2d at 304 ("Although a trial court's ruling concerning *Rule* 55 evidence is entitled to deference, that ruling does not preclude appellate review. The Appellate Division in the interlocutory appeal found that the trial court had abused its discretion in excluding the other-crime evidence."). That's not all. It conducts a referendum to validate its conclusion, counting as votes in support of its result the two Appellate Division judges who "erred ... [by] overturn[ing] the trial court's decision not to admit the other crime evidence." *See ante* at 491–92, 691 *A*.2d at 303–04 ("At least two judges in the Appellate Division and five members of this Court have disagreed with the trial court's decision that the prejudicial effect of that evidence required exclusion.")

The majority's analysis focuses unduly on the logical relevance of the controverted evidence. The fallacy in the Court's approach is its equation of logical relevance with admissibility; in effect, it gives determinative weight to the first-prong of *Cofield*, neglecting the kind of balancing that is required by the fourth prong. The majority thus cites and discusses a great many cases that support the position that this evidence is relevant. *See ante* at 486–90, 691 *A*.2d at 301–03. Those cases do support the conclusion of the trial court that the evidence is logically relevant and satisfies the first-prong of *Cofield*. That decisional law, however, does not address the issue of whether the error in this case—the admission of such logically relevant evidence, the prejudicial impact of which outweighs its probative worth—was harm-

less. Moreover, other cases cited by the majority where this or another appellate court found on distinctive facts that prejudice did not sufficiently outweigh probativeness are distinguishable. *See ante* at 490, 691 *A.*2d at 303.

## II

"The test of whether an error is harmless depends upon some degree of possibility that it led to an unjust verdict. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Bankston,* 63 *N.J.* 263, 273, 307 *A.*2d 65 (1973). This standard requires the reviewing court to examine the *trial itself* to determine whether the error may have led to an unjust verdict. It neither requires nor permits an analysis of whether, in another case with facts similar to the present one, it would have been permissible for the trial court to admit the other-crimes evidence here proffered by the prosecution.

A proper analysis of whether or not the error was harmless in this case should begin with the findings of the trial court. The trial court did not base its determination that the prejudice emanating from the other-crimes evidence unavoidably out-weighed its probative worth on an abstract analysis made in advance of the prosecution's evidence. It prudently deferred ruling on admissibility until provided the opportunity to consider the evidence of the prosecution at the conclusion of its case; it is in that context that the court found that admission would unduly prejudice the jury against defendant. The court felt that "because of the circumstances of this case"—referring to the nature of the prior offenses and the fact that this was a prosecution for aggravated sexual assault and murder—the jury would be unable to follow an instruction that the evidence could be considered to determine only the degree of homicide perpetrated by the defendant.

Because of its familiarity with the progress of the trial, the nature and quality of the prosecution's evidence, the feel of the

courtroom, and sense of the jury's impression of the defendant, the trial court's opinion as to the impact of a particular piece of evidence should be given great weight in the retrospective harmless error analysis undertaken by a reviewing court. That is especially so when it is the decision of the trial court to keep certain evidence from the jury, although a decision to admit certain evidence is also entitled to broad deference under the abuse of discretion standard. *See State v. Carter*, 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982) ("On appellate review, the decision of the trial court must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted."). This asymmetrical proposition is borne out by the empirical fact that it is the rare case in which an appellate court orders the admission of evidence over the objection of the trial court. *See* Richard J. Biunno, *New Jersey Rules of Evidence*, comments on *N.J.R.E.* 403 (1995). It is much less rare for a reviewing court to reverse a trial court's decision to admit such "double-edged" other crime evidence.

Clearly relevant to the determination of whether an erroneous admission of other-crimes evidence is harmless is the other evidence before the jury on the issue for which the evidence was wrongfully admitted. Here, the appellate court in its initial interlocutory ruling ordered the admission of the other-crimes evidence on the ground that it could be used to determine the type and degree of homicide committed by defendant. That, to repeat, has only to do with the logical relevance of the evidence, and that ruling, we all agree, was error. An analysis as to whether it was harmless error cannot, however, look to overwhelming evidence of *guilt*, that is, the commission of the homicidal act; rather, the analysis should focus on whether there was overwhelming evidence of defendant's *intent* to commit murder—the issue for which the erroneously admitted evidence was proffered. It is therefore inappropriate for the majority to point to the overwhelming evidence that the prosecution "got the right man," such as the jailhouse statement and circumstantial evidence, such as the

similar groove pattern of the tire tracks left at the scene, and the debris recovered from the defendant's vehicle.

The court charged the jury on both manslaughter and purposeful murder, and thus the defendant's intent to commit murder was a crucial issue in the case. As the majority candidly admits, the record is virtually barren of any indication that this defendant intended to commit murder aside from the other-crimes evidence. *See ante* at 496, 691 *A.*2d at 306. In closing, the prosecution argued to the jury that defendant's intent to kill was evident based on two facts: (1) an interpretation of defendant's statement to Guy Bishop, and (2) the motive to kill provided by the two prior sexual assault convictions and the fear of going back to prison. Of course, defendant's statement to Guy Bishop—that the victim died during rough sex—in and of itself would support only a manslaughter conviction. Indeed, it supports defendant's position that the victim's death was not purposeful. The prosecution, however, argued that the testimony of Guy Bishop was an attempt by defendant to minimize his intentional act. The prosecution's main argument on this issue derived from its motive theory:

> Well, now you know what the motive is, ladies and gentlemen. Now, you [know] why he had to kill her. If he didn't silence her, he was going to be put in jail right away and he was going to get more time. He had just pled guilty to a sexual assault, a rape. That's what a sexual assault is—on August 25, 1988. He had been released ROR (on his own recognizance) which meant that he had to be good and if he—he raped her, but he couldn't let her live, because if he had let her live, she would go to the police and what that would mean is that he would get back in jail, and he would get more time than what he had been told he would get. . . . So he couldn't let her live. He had to silence her. That's why, ladies and gentlemen, he killed [F. C]. . . . that is his motive for killing her.

In light of the fact that this jury had a choice between convicting defendant of either purposeful murder or reckless manslaughter, the record inescapably raises the real possibility that the erroneous admission of the other-crimes evidence "led the jury to reach a result that it otherwise might not have reached." *Bankston, supra,* 63 *N.J.* at 273, 307 *A.*2d 65.

Also relevant to the harmless-error inquiry are the instructions provided to the jury. At first it may seem somewhat counter-

intuitive to think that an instruction appropriate to a situation where the evidence is properly before the jury could operate to "save" a conviction from the taint of erroneously admitted evidence. The problem may be more acute, however, where the ground for exclusion is that the evidence was not relevant to prove a material issue in the case. After all, it is difficult to comprehend how a trial court would go about instructing the jury on how to handle properly a piece of evidence not relevant to any issue in the case. In this case, however, the ground for exclusion was the trial court's sense that the evidence was too unduly prejudicial to be safely before the jury. We have recognized that other-crimes evidence is almost always prejudicial. *State v. G.S.*, 145 *N.J.* 460, 468, 678 *A.*2d 1092 (1996). Any finding that prejudice does not substantially outweigh probative worth necessarily is dependent on correct and effective jury instructions that will guarantee that the balance struck by the court in determining admissibility will be maintained by the jury in its assessment of that evidence. Consequently, the role of the instruction becomes even more critical and determinative in the retrospective harmless-error inquiry. That inquiry demands an examination of the adequacy and efficacy of the instruction in the context of the entire case.[3] It is a flaw in the majority's analysis, therefore, that it fails to consider the concededly inadequate jury instruction as a part of and within its analysis of whether the admission of the other-crimes evidence itself was harmless error. Only by performing a logically artificial "bifurcation" of the analysis—and then subjecting its treatment of the jury instruction to the more demanding "plain error" stan-

---

[3] It is unclear, though, whether even an ideal instruction could by itself render harmless the erroneous admission of other crimes evidence in a case such as this. When a trial court takes the relatively extraordinary step of excluding relevant evidence on the ground that it is too prejudicial, the court presumably does so on the assumption that it plans to provide a comprehensive and detailed instruction. When the person most familiar with the trial itself concludes, on this assumption, that even an ideal instruction would not sufficiently protect a defendant's right to a fair trial, I am hard pressed to see how an appellate court could reach a contrary conclusion in hindsight.

dard—can the majority purport to claim that the error in the use of the other-crimes evidence was harmless.

### III

On many occasions this Court has emphasized the critical importance of a sound instruction to guide the jury's use of inherently prejudicial other-crimes evidence. *See, e.g., State v. Oliver,* 133 *N.J.* 141, 627 *A.*2d 144 (1993) (holding that other crimes evidence was properly before jury but finding charge inadequate to properly guide jury's use of that evidence); *Cofield, supra,* 127 *N.J.* 328, 605 *A.*2d 230 (reversing conviction because the charge failed to narrowly focus jury's attention on the specific permissible uses of the properly admitted other crimes evidence); *Stevens, supra,* 115 *N.J.* at 304, 558 *A.*2d 833 (finding instruction on properly admitted other crimes evidence wanting, although not reversible error, and stating that "... a limiting instruction addressed to the use of the other-crime evidence admitted under *Rule* 55 should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere"); *see also G.S., supra,* 145 *N.J.* 460, 678 *A.*2d 1092 (emphasizing necessity of detailed and comprehensive limiting instruction in cases involving other crimes evidence).

As noted by the majority, *ante* at 496, 691 *A.*2d at 306, "incorrect instructions of law are poor candidates for rehabilitation under the harmless error theory." *State v. Wilson,* 128 *N.J.* 233, 241, 607 *A.*2d 1289 (1992) (quoting *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987). This is especially so when the incorrect instructions relate to how the jury is to handle evidence that poses "special dangers" of improper influence. *G.S., supra,* 145 *N.J.* at 469, 678 *A.*2d 1092; *see also Stevens, supra,* 115 *N.J.* at 309, 558 *A.*2d 833 ("The inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction."); *Cofield, supra,* 127 *N.J.* at 343, 605 *A.*2d 230 (Stein,

J., concurring) (questioning efficacy of even perfect limiting instruction in some other crimes cases). I would place an extraordinarily heavy burden on the State to justify a conviction obtained in a case where an insufficient limiting instruction relates to such inflammatory evidence. A good example of a case in which the conviction was sustainable despite an insufficient instruction is *G.S., supra,* 145 *N.J.* 460, 678 *A.*2d 1092. There, we found the charge to be insufficient because it failed to focus properly the jury's attention on the specific permissible uses of the other crimes evidence; the charge did, however, specifically warn—on three separate occasions—against the forbidden inference that defendant was a bad person or predisposed to commit the charged offense. Because the charge in *G.S.* "successfully delivered the essential point," *id.* at 474, 678 *A.*2d 1092, we were able to find that the insufficient charge did not amount to plain error. *See also Stevens, supra,* 115 *N.J.* 289, 558 *A.*2d 833 (finding that insufficient charge, which failed to properly identify the permissible uses of the other-crimes evidence, was harmless error because it contained several admonitions against the forbidden inference). Even a specific direction to not consider other-crimes evidence for purposes of predisposition might not be enough to save an otherwise insufficient instruction. *See Cofield, supra,* 127 *N.J.* 328, 605 *A.*2d 230 (holding reversible error where, although charge informed jury it could not use other-crimes evidence to show defendant's predisposition to commit charged offense, it did not sufficiently inform jury as to specific purposes for which evidence could be used).

## IV

The message of our prior decisions is that even where other-crimes evidence is properly before the jury, a near-perfect instruction is essential. In those rare cases where we have found an insufficient instruction to be harmless error or an otherwise inappropriate ground for reversal, it has been because the charge thoroughly emphasized the "negative side" of the ideal instruction:

that the jury could not use the evidence as indicative of defendant's bad character or criminal predisposition. *See, e.g., G.S., supra,* 145 *N.J.* 460, 678 *A.*2d 1092; *Stevens, supra,* 115 *N.J.* 289, 558 *A.*2d 833. This is sensible because such an inference is the primary threat to defendant's fair trial right whenever other crimes evidence is before the jury. In this case, however, the instruction did little to convey "the essential point" of the ideal instruction; the court merely told the jury that it could not use the other crimes evidence "on any of the charges that have been presented by the State with the exception of the homicide charge."[4] *Cf. Cofield, supra,* 127 *N.J.* 328, 605 *A.*2d 230 (finding reversible error where charge informed jury that other crimes evidence could only be considered for "some other fact in issue").

Disregarding the standard that has evolved from our prior decisions, the majority views the instruction provided in this case as falling somewhere between the approved instruction provided in *Cusick* and the insufficient instruction rejected in *Oliver*. It is totally inappropriate to view our prior decisions as creating such a legal limbo; rather, our decisions create a threshold beyond which no instruction may traverse. These decisions could not be more emphatic in underscoring the necessity for clear and express instructions to foreclose the misuse of other-crimes evidence. It is, therefore, sophistic and disingenuous for this Court to fob off the absence of clear and express statements in these instructions by saying that they "*implicitly* told the jury not to use the other crimes evidence for propensity." *Ante* at 496, 691 *A.*2d at 306. That ruling is both a departure from and an unfortunate obfuscation of the firm lesson established by our prior decisions on this issue.

---

[4] The only elaboration on the "negative" side of the other crimes instruction was a recital of those non-homicide charges for the jury: "So that, ladies and gentlemen, my instructions to you are that you may not use that evidence in your considerations for any purpose in connection with your considerations of the charges of kidnapping or aggravated sexual assault. . . ."

## VI

At the conclusion of its opinion, the majority states that all of the errors committed with regard to this trial are either harmless or not plain error because there was overwhelming evidence of defendant's "guilt." *See ante* at 496, 691 *A.2d* at 306. Although likely guilty of some crime, defendant surely was entitled to a fair trial to determine the actual extent of his legal responsibility.

The only inquiry this Court should undertake is whether the several conceded trial and appellate errors had the capacity to lead the jury to reach a result it otherwise might not have reached. Surely it did. An aggravated manslaughter conviction was a distinct possibility in this case. The majority answers the wrong question when it concludes that the appellate order was harmless error essentially because the trial court would not have abused its discretion had it decided to admit the evidence. The fact is that the trial court did not abuse its discretion to exclude the evidence. The majority exacerbates its error when it skews the law to support its conclusion that the instruction in this case was not in and of itself reversible error.

The various trial and appellate errors that occurred in this case unquestionably denied defendant of his right to a fair trial. I cannot join in the opinion of the Court that disregards that denial.

I dissent.

*For affirmance*—Chief Justice PORITZ, and Justices POLLOCK, O'HEARN, GARIBALDI, STEIN and COLEMAN—6.

*Dissenting*—Justice HANDLER—1.