NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5225-14T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

DREU FERGUSON JR., a/k/a
DREW FERGUSON,

 Defendant-Appellant.
_______________________________________

 Argued June 8, 2017 – Decided August 11, 2017

 Before Judges Hoffman, O'Connor and Whipple.

 On appeal from Superior Court of New Jersey,
 Law Division, Cumberland County, Indictment
 No. 11-08-0708.

 Marcia Blum, Assistant Deputy Public
 Defender, argued the cause for appellant
 (Joseph E. Krakora, Public Defender,
 attorney; Ms. Blum, of counsel and on the
 brief).

 Danielle R. Pennino, Assistant Prosecutor,
 argued the cause for respondent (Jennifer
 Webb-McRae, Cumberland County Prosecutor,
 attorney; Ms. Pennino, of counsel and on the
 brief).

PER CURIAM
 Defendant Dreu Ferguson, Jr., appeals from his conviction

and sentence for aggravated manslaughter, desecrating human

remains, and tampering with evidence. We affirm in all

respects, but remand so the judgment of conviction may be

corrected.

 I

 On March 18, 2015, a jury acquitted defendant of first-

degree murder, N.J.S.A. 2C:11-3(a)(1) and (2), but found him

guilty of the lesser-included offense of first-degree aggravated

manslaughter, N.J.S.A. 2C:11-4(a)(1); second-degree desecrating

human remains, N.J.S.A. 2C:22-1(a)(1); and third-degree

tampering with evidence, N.J.S.A. 2C:28-6(1). On May 18, 2015,

he was sentenced to an extended life term, with a parole

ineligibility period of sixty-three years and nine months.

 We recount the salient evidence adduced at trial. In May

2009, defendant lived with his father, D.F. (father), and

grandmother, V.F. (grandmother). The father worked at night and

cared for the grandmother, who suffered from dementia, during

the day.

 One of the father's brothers, K.F. (Kevin),1 testified the

father called him three times on May 12, 2009. The first time

1
 To protect his privacy, we refer to him and other family
members and acquaintances through the use of pseudonyms.
 2
 A-5225-14T1
he called the father reported he had locked himself in his car

because defendant and his girlfriend, A.H. (Anne), had

threatened to kill him. Kevin told the father to call the

police. Fifteen minutes later, the father called Kevin and

sounded more relaxed, stating he was not going to call the

police. About an hour and a half later, the father called Kevin

and reported, "everything [is] going to be okay."

 Kevin did not hear from the father again, which was "very

out of the ordinary." On May 24, 2009, Kevin reached out to his

brother, B.F. (Brian), and told Brian of his concerns. That

same day, Brian went to and entered the father's house, and

discovered he was not at home. However, Brian noticed the

father's glasses, which "were normally on his face," were in the

house and the father's car was parked outside.

 Brian left the house and reported his brother missing to

the police. The police searched the house, but did not find

anything remarkable and left. Brian returned to the house the

next morning and noticed the father's car was still parked on

the property. Brian called out the father's name, and defendant

emerged from and stopped Brian from entering the house.

Defendant stated he did not know where his father was. Brian

went to the police department and returned with a police

officer.
 3
 A-5225-14T1
 The officer testified defendant informed him that he had

not heard from or seen his father since Wednesday, May 20, 2009.

Defendant then let the police officer and Brian into the house.

Defendant's wallet and cell phone were found in the house. The

officer asked and defendant admitted he and the father recently

had an argument, but claimed the argument did not get

"physical." At Brian's request, defendant moved out of the

house that day.

 The police decided to secure a search warrant of the house.

When officers returned to the premises to acquire details about

the property for the search warrant, they noticed a foul odor

under the porch. After obtaining the warrant on May 26, 2009,

the police searched the premises and discovered the father's

body in a hole covered with a metal grate under the porch. The

body was covered with lime. Defendant was immediately arrested

and charged with desecrating human remains, N.J.S.A. 2C:22-

1(a)(1), and terroristic threats, N.J.S.A. 2C:12-3.2 In August

2011, defendant was indicted for first-degree murder.

 Anne testified she had been dating defendant for about one

month before the father's body was found. On Tuesday, May 19,

2009, she was in defendant's bedroom in the basement when she

heard defendant and the father arguing in the living room. She

2
 The charge of terroristic threats was dismissed before trial.
 4
 A-5225-14T1
heard the father say, "No, stop. Please don't. Help me." When

she went upstairs to investigate, defendant intercepted her in

the kitchen and told her to go outside. She complied and,

approximately one hour later, defendant came outside. When she

re-entered the house, the father was gone.

 Over the next few days, Anne intermittently left the house

for an hour or two, but otherwise remained at the house. During

this period she did not see the father, although his car was

always parked outside. She asked defendant where his father

was, but he did not know and seemed unconcerned about his

whereabouts.

 Just before his disappearance, the father had hired a home-

health aide to come to the house twice a week to help him care

for the grandmother. When the aide arrived on May 22, 2009 to

provide care, defendant told her his father "wasn't going to be

[here] anymore," and that defendant had taken over his

grandmother's care.

 After his arrest on May 26, 2009, defendant was placed in

the county jail. While there, another inmate, H.A., testified

defendant told him: (1) the State would have a hard time

convicting him because no one had seen him do "anything"; (2)

the biggest mistake he made was not getting rid of his father's

car because it was known the father disliked walking, even very
 5
 A-5225-14T1
short distances, and thus never left home without his car; and

(3) his father's body never smelled, so defendant never had to

move it. H.A. admitted he contacted the Prosecutor's Office to

report defendant's statements in the hope the State would be

lenient in his own matter. However, H.A. also testified the

State never made any promises to him about any of the evidence

he revealed.

 Ian Hood, M.D., forensic pathologist, conducted the autopsy

of the father's body. Hood was unable to provide the final

cause of death. Given the state of decomposition, he could not

discern if the body sustained any external injury or trauma.

However, he was able to determine on gross examination the

father did not have any disease or condition to explain his

death, such as cancer or heart disease, and had not had a

stroke.

 Although the condition of the body did preclude a

histological examination, which can uncover the existence of

certain diseases on a cellular level, Hood noted the father,

fifty-eight years of age at the time of his death, appeared to

be in overall good health. The father had some mild

hypertension that was treated with medication, but this

condition had not caused any damage.

 6
 A-5225-14T1
 Hood explained that even though he was unable to identify

the cause of death, he was required to put a cause of death on

the death certificate. He stated the final cause of death was

"homicide by unspecified means - asphyxia not excluded." He

also had to identify the manner of death, and was required to

check-off one of the five selections provided on the death

certificate under the category "manner of death." The

selections from which to choose were natural, accident, suicide,

homicide, and undetermined.

 Hood determined the manner of death was homicide. He

reasoned that, despite the degree of decomposition, he was able

to ascertain the father was in good health before his death. In

addition, the victim's body had been concealed, which was a

"suspicious circumstance[]." However, he emphasized his opinion

the manner of death was a homicide had no bearing on whether

there was a homicide as a matter of law, stating:

 [The body was] secreted away under a porch,
 wrapped and covered with debris and covered
 with lime.

 In other words, there's been a distinct
 effort made to conceal his body. And
 generally when that has happened, it's
 because the body has met its end by other
 than natural or accidental means. . . .
 And usually, it's a young person who's found
 out in the Pinelands . . . buried in a
 shallow grave.

 7
 A-5225-14T1
 Obviously that is suspicious enough that we
 assume they are homicides. But remember, as
 a medical examiner, I'm filling out a death
 certificate so that the state and federal
 government can keep some reliable statistics
 on how people died by manner. It doesn't
 mean that that's going to lead to a
 prosecution or that it meets the criteria
 the law would require for a homicide.

 My calling something a homicide has no
 bearing on what the law requires. I will
 call things homicides that in fact are not
 prosecuted. They're considered excused.
 So, it's a different situation for what a
 death certificate requires, it is completely
 different for what the law requires for a
 prosecution. . . .

 [Homicide is] what I put on a death
 certificate. And in this kind of case . . .
 I think most of my colleagues would fill it
 out that way. Because it's more likely to
 be a homicide than not. It doesn't mean
 someone is going to get prosecuted, though.
 . . .

 There were no specific findings on the body
 that would let me call it a homicide. . . .
 But I did not have an anatomic cause of
 death after completing his autopsy.

 Significantly, Hood also testified he could not state

within a reasonable degree of medical certainty a homicide had

occurred.

 Defendant called forensic pathologist Jonathan L. Arden,

M.D., as an expert. Arden testified the term "cause of death"

is "the underlying process that sets in motion an unbroken

sequence of events that ends in the death of the person." He
 8
 A-5225-14T1
defined "manner of death" as "the explanation for how the cause

of death came about," which is "really largely dependent on

circumstances" and is "highly dependent on investigation." He

also observed the recognized categories for the manner of death

are homicide, suicide, accident, natural, and undetermined. He

added:

 Manner of death is an administrative ruling,
 an opinion that is used for purposes of
 keeping vital statistics. It's a concept
 that was actually invented in the United
 States, and it is a way of categorizing or
 classifying different deaths. One of the
 big reasons that we have cause of death and
 manner of death that get officially recorded
 on death certificates is because those go to
 your local vital statistics arm of your
 health department in your county, in your
 state. And eventually those statistics,
 causes and manners of death, and some other
 features, all funnel up to the Federal
 Government, and they're done on a national
 level.

 But the point of categorizing them,
 including manner of death, is so you can
 figure out how many people die, at what ages
 are people dying, how are they dying, why
 are they dying. It's a matter of, that's
 the heart of vital statistic[s].

 Arden testified a medical examiner's opinion of the cause

and manner of death is not a legal opinion.

 The manner of death is strictly for purposes
 of vital statistics. It has no force of law
 . . . It has no implication, . . . . It is
 not a determining factor for whether a crime
 has been committed, whether someone is
 9
 A-5225-14T1
 guilty or not. . . . Homicide, or manner of
 death, simply means death at the hands of
 another person. It's not up to the medical
 examiner to decide if it's a crime.

 Arden stated a body found in a crawlspace "like in this

case" indicated there was a homicide, that "[a] death occurred

at the hands of another person." He stated he would have

certified the manner of death in this matter as a homicide.

Finally, he testified he was unable to determine the father's

cause of death.

 II

 On appeal, defendant asserts the following arguments for

our consideration:

 POINT I – THE MEDICAL EXAMINER SHOULD NOT
 HAVE BEEN ALLOWED TO TESTIFY THAT THE CAUSE
 AND MANNER OF DEATH WERE HOMICIDE BECAUSE:
 (1) HE ADMITTED THAT HE DID NOT KNOW THE
 CAUSE OF DEATH; (2) HE ERRED IN DESIGNATING
 "HOMICIDE" AS THE CAUSE BECAUSE THE CAUSE OF
 DEATH IS A MEDICAL FINDING; (3) HIS OPINION
 THAT HOMICIDE WAS BOTH THE CAUSE AND MANNER
 OF DEATH WAS NOT BASED ON EXPERT KNOWLEDGE;
 AND (4) THE JURORS DID NOT NEED AN EXPERT
 OPINION TO ASSESS THE CAUSE OF DEATH.

 POINT II – THE COURT ERRED IN DENYING THE
 SPEEDY TRIAL MOTION, WHICH WAS FILED AFTER
 DEFENDANT HAD BEEN IN JAIL MORE THAN TWO
 YEARS WITHOUT BEING INDICTED.

 POINT III – DEFENDANT WAS PREJUDICED BY THE
 ABSENCE OF A COOPERATING WITNESS CHARGE
 INSTRUCTING THE JURY THAT IT WAS REQUIRED TO
 GIVE CAREFUL SCRUTINY TO THE JAILHOUSE-
 SNITCH'S TESTIMONY.
 10
 A-5225-14T1
 POINT IV – THE EXTENDED LIFE TERM IS A
 GROSSLY EXCESSIVE SENTENCE.

 POINT V – THE JUDGMENT OF CONVICTION MUST BE
 AMENDED TO REFLECT THE FACT THE JURY
 ACQUITTED DEFENDANT OF MURDER AND CONVICTED
 HIM OF THE LESSER-INCLUDED OFFENSE OF
 AGGRAVATED MANSLAUGHTER.

 As for Point V, we agree, as does the State, the judgment

of conviction is inaccurate and must be corrected. However, we

are unpersuaded by the remaining arguments and affirm. We

address each argument seriatim.

 A

 Defendant contends the admission of Hood's opinion there

was a homicide was error. Defendant asserts such opinion not

only exceeded the bounds of Hood's expertise as a physician, but

also was one the jury was capable of reaching without the aid of

an expert. Defendant argues by admitting this opinion, the

court allowed Hood "to cloak his speculation about the cause and

manner of death in the mantle of expertise." As we understand

defendant's argument, Hood's opinion the father was the victim

of a homicide improperly induced the jury to conclude the father

died as the result of a homicide rather than of natural causes.

We disagree with this contention.

 We recited the relevant portions of Hood's and Arden's

testimony to expose the frailties of defendant's argument. When
 11
 A-5225-14T1
viewed in context, Hood did not proffer an opinion that exceeded

the bounds of his expertise or improperly invade the jury's

province of determining those facts that do not require expert

testimony to understand. See N.J.R.E. 702. Hood made it

eminently clear he did not know the cause of death. As for the

manner of the death, for the purpose of providing statistical

data to the government, Hood was required to check off the

manner of death from a choice of five selections on the death

certificate.

 Hood concluded the most accurate choice under the

circumstances was homicide. However, he acknowledged he could

not state within a reasonable degree of medical certainty a

homicide had occurred. Moreover, he made it clear his opinion

of what constitutes a homicide is not the same as what

constitutes a homicide under the law, and that his opinion had

no bearing on the jury's task of determining whether a homicide

had occurred.

 Ironically, defendant's expert forensic pathologist shared

the same opinions. Arden testified a medical examiner's opinion

of the manner of a death is provided solely for providing vital

statistics. More important, Arden noted a medical examiner's

opinion a homicide has occurred is not a legal one and, further,

 12
 A-5225-14T1
given the father's body was concealed, he would have certified

the manner of death in this matter as a homicide.

 The admissibility of evidence, including that of expert

testimony, is a matter within the sound discretion of the trial

court. State v. McGuire, 419 N.J. Super. 88, 123 (App. Div.),

certif. denied, 208 N.J. 335 (2011). "Under that standard, an

appellate court should not substitute its own judgment for that

of the trial court, unless 'the trial court's ruling was so wide

of the mark that a manifest denial of justice resulted.'" State

v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero,

148 N.J. 469, 484 (1997)). For the reasons provided in our

analysis of the experts' testimony, we are satisfied the court

did not abuse its discretion in admitting the subject testimony

provided by Dr. Hood.

 B

 On May 26, 2009, defendant was arrested and charged with

desecrating human remains and terroristic threats. He was never

released from custody thereafter. In August 2011, defendant was

indicted for murder. Defendant filed a motion to dismiss all

charges on the ground his rights to a speedy trial were

violated. In opposition to the motion, the assistant prosecutor

submitted a certification detailing the State's efforts to

acquire evidence to substantiate the indictment for murder.
 13
 A-5225-14T1
 The court denied the motion, finding the certification

provided an explanation for the delay and that it was not

unreasonable. Among other things, the certification noted the

evidence the State collected required extensive analyses by

various laboratories, including an FBI laboratory in Virginia.

Also contributing to the delay was some of the testing was going

to destroy the evidence. The State was required to notify

defendant and suspend testing until any issues he raised were

resolved, causing further delay. Finally, although the trial

court recognized there is an inherent prejudice if a defendant

is in custody awaiting trial, defendant was not otherwise

prejudiced by the delay.

 Defendant contends the trial court erred when it denied his

motion, asserting his rights to a speedy trial were violated,

warranting a reversal. We disagree.

 The United States and New Jersey Constitutions both

guarantee a defendant a right to a speedy trial. U.S. Const.

amend. VI; N.J. Const. art. I, ¶ 10. In determining whether

this right has been violated, courts must consider four factors:

(1) the length of the delay; (2) the reasons for the delay; (3)

whether and how the defendant asserted his right to a speedy

trial; and (4) any prejudice to the defendant caused by the

delay. Barker v. Wingo, 407 U.S. 514, 530-33, 92 S. Ct. 2182,
 14
 A-5225-14T1
2192-93, 33 L. Ed. 2d 101, 116-19 (1972); State v. Szima, 70

N.J. 196, 200-01 (adopting the Barker test and noting that the

right to a speedy trial is relative and depends upon the

circumstances), cert. denied, 429 U.S. 896, 97 S. Ct. 259, 50 L.

Ed. 2d 180 (1976).

 No single factor under this four-part test is dispositive;

rather, they are related and must be considered together, along

with any "such other circumstances as may be relevant." Szima,

supra, 70 N.J. at 201. The remedy for violating the right to a

speedy trial is dismissal of the indictment. Barker, supra, 407

U.S. at 522, 92 S. Ct. at 2188, 33 L. Ed. 2d at 112.

 Defendant bears the burden of establishing a violation of

his speedy trial right. State v. Berezansky, 386 N.J. Super.

84, 99 (App. Div. 2006). In addition, a trial court's factual

determination on a speedy trial issue "should not be overturned

unless [it is] clearly erroneous." State v. Merlino, 153 N.J.

Super. 12, 17 (App. Div. 1977).

 Having fully considered the arguments, we affirm the denial

of defendant's motion for substantially the same reasons

expressed by the trial court. The court properly considered (1)

the length of the delay, (2) the reasons for the delay, (3)

whether and how the defendant asserted his right to a speedy

trial, and (4) any prejudice to the defendant caused by the
 15
 A-5225-14T1
delay, and correctly determined there was no basis to grant the

motion. The explanation provided by the State in this complex

matter put the delay in perspective and demonstrated why the

delay was not unreasonable. Moreover, defendant failed to show

the delay compromised his defense in any way.

 C

 Defendant contends H.A.'s testimony required the court to

provide the cooperating witness charge. Defendant did not

object to the jury charge at the time of trial. Accordingly,

defendant's argument is subject to the plain error rule. R.

2:10-2.

 The model cooperating witness charge states in relevant

part:

 [The witness] has testified to facts which
 may show some involvement on [his] part in
 another criminal matter. The law requires
 that the testimony of such a witness be
 given careful scrutiny. In weighing his
 testimony, therefore, you may consider
 whether he has a special interest in the
 outcome of the case and whether his
 testimony was influenced by the hope or
 expectation of any favorable treatment or
 reward, or by any feelings of revenge or
 reprisal.

 If you believe this witness to be credible
 and worthy of belief, you have a right to
 convict the defendant on his testimony
 alone, provided, of course, that upon a
 consideration of the whole case, you are

 16
 A-5225-14T1
 satisfied beyond a reasonable doubt of the
 defendant's guilt.

 [Model Jury Charge (Criminal), "Testimony of
 a Cooperating Co-Defendant or Witness"
 (2006).]

In other words, the cooperating witness instruction informs the

jury a witness who has been implicated in a criminal matter may

have provided testimony helpful to the State in exchange for the

State's favorable treatment of his or her own criminal matter.

 Here, the defense attorney skillfully cross-examined H.A.,

exacting from him he contacted the State to provide the evidence

about which he testified solely to gain an advantage in his own

matter. Moreover, the court instructed the jury on credibility,

which adequately addressed any potential credibility issues

raised by H.A.'s testimony. In light of the testimony that

emerged during H.A.'s cross-examination and the charge on

credibility, we reject defendant's contention the court

committed plain error by failing to provide the cooperating

witness charge.

 D

 Defendant maintains his sentence was excessive, but the

record supports the findings challenged on appeal.

 We review a "trial court's 'sentencing determination under

a deferential standard of review.'" State v. Grate, 220 N.J.

 17
 A-5225-14T1
317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606

(2013)). We may "not substitute [our] judgment for the judgment

of the sentencing court." Lawless, supra, 214 N.J. at 606. We

must affirm a sentence if: (1) the trial court followed the

sentencing guidelines; (2) its findings of fact and application

of aggravating and mitigating factors were based on competent,

credible evidence in the record; and (3) the application of the

law to the facts does not "shock[] the judicial conscience."

State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v.

Roth, 95 N.J. 334, 364-65 (1984)).

 At the time of sentencing, the court determined the

following aggravating factors applied: three, N.J.S.A. 2C:44-

1(a)(3) (the risk of reoffending); six, N.J.S.A. 2C:44-1(a)(6)

(prior criminal record); and nine, N.J.S.A. 2C:44-1(a)(9) (the

need to deter). The court also found mitigating factor four

applied, N.J.S.A. 2C:44-1(b)(4) (substantial grounds existed to

excuse or justify the conduct, but fail to establish a defense).

 Defendant contends the court applied the first aggravating

factor, N.J.S.A. 2C:44-1(a)(1) (the nature and circumstances of

the offense, including whether it was committed in an especially

heinous, cruel, or depraved manner), and maintains the

consideration of such factor was error. However, the record

 18
 A-5225-14T1
reveals that, although the court considered this factor, the

court ultimately rejected it as inappropriate.

 Defendant maintains the court failed to accord the

appropriate weight to mitigating factor four. At sentencing,

defendant argued he suffers from schizoaffective disorder. In

support of this contention, defendant appended a partial

transcript of the testimony of a psychologist who appeared on

his behalf at a 2006 trial on a charge defendant committed

voluntary manslaughter.

 The court in the within matter considered the testimony and

determined it would accord defendant's mental health history

only "very slight weight" because, according to the

psychologist's testimony, the disorder "waxes and wanes." The

court also noted the information about defendant's condition was

dated, and "[n]othing current" had been submitted. The court's

comments revealed an understandable reticence to accord more

weight to defendant's disorder because it affected defendant's

behavior only intermittently, and there was no evidence this

affliction played any role in the father's death.

 Defendant's remaining arguments on sentencing are without

sufficient merit to warrant discussion in a written opinion. R.

2:11-3(e)(2).

 19
 A-5225-14T1
 E

 Finally, the judgment of conviction states the murder

charge was amended to aggravated manslaughter. Both the State

and defendant agree the judgment of conviction must be corrected

to reflect the jury found defendant not guilty of first-degree

murder and guilty of first-degree aggravated manslaughter.

Accordingly, we remand this matter so the judgment may be

amended to reflect the correct disposition of the murder charge.

 We affirm defendant's convictions and sentence, but remand

for the purpose of correcting the judgment of conviction in

accordance with this opinion. We do not retain jurisdiction.

 20
 A-5225-14T1