**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3652-18T3
              A-4134-18T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

STERLING C. SPENCE, a/k/a
STERLING SPENCE JR.,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MAURICE BURGESS, a/k/a
MAURICE DE'ANDRE
BURGESS, MAURICE
BURGES, and MOE,

      Defendant-Appellant.

_____

Submitted December 7, 2020 – Decided December 23, 2020

Before Judges Fasciale and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment Nos. 13-01-0083 and 17-08-1760.

Joseph E. Krakora, Public Defender, attorney for appellant Sterling C. Spence (Michele A. Adubato, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Maurice Burgess (Frank M. Gennaro, Designated Counsel, on the brief).

Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent (John J. Lafferty, IV, Assistant Prosecutor, of counsel and on the brief).

Appellant Sterling Spence filed a pro se supplemental brief.

PER CURIAM

In these back-to-back appeals, which we have consolidated for purposes of this opinion, Sterling Spence (Spence) and Maurice Burgess (Burgess) (collectively defendants) appeal from multiple convictions related to the murder of DeVonte Molley (the victim), which took place in the course of a robbery of the victim at an Atlantic City hotel (the Hotel). We affirm as to both defendants.

On December 21, 2015, the victim, Burgess, and an acquaintance were staying in a room at the Hotel which was registered to the victim. The victim and Burgess sold heroin out of the room and occasionally left to facilitate sales. That night,

Burgess texted Charles Wynn[1] (Wynn) to ask if he knew anyone who wanted to purchase heroin. Wynn called Spence to ask if he personally had any drugs to sell. Spence contacted Burgess, who told Spence to search the dresser in the Hotel room to retrieve more drugs to sell.

Spence and Wynn entered the Hotel and went to the eighth-floor stairwell so that the manager would not see the them moving drugs and call the police. Burgess let them into the Hotel room and then left to sell drugs. The victim was asleep on the couch when Spence and Wynn entered. Wynn went into the bedroom to check the dresser drawer for drugs while Spence went to the bathroom.

As Spence exited the bathroom, he saw the victim walking towards the bedroom with a gun. Spence called out to the victim to let him know that he and Wynn were in the Hotel room, and then the victim turned towards Spence and pointed the gun at him. Spence slapped the gun out of the victim's hand, resulting in both the victim and Spence struggling for control over the gun. The gun discharged while the victim and Spence were struggling for the gun and Spence was attempting to turn the gun away. The victim fell to the ground, and both Spence and Wynn fled.

---

[1] Charles Wynn is also a co-defendant. The three were tried together, however, Wynn is not participating in this appeal.

A-3652-18T3

Police responded to the scene and found the victim, who was still alive, lying on the floor of the lobby with a gunshot wound. A bystander (the bystander), attempted to administer medical assistance to the victim but was unsuccessful. An autopsy later determined that the victim died from a gunshot wound to the lower abdomen on his right side. Police interviewed the bystander within twenty-four hours of the incident. Police also found heroin, a digital scale, an LG cellphone, and a nine-millimeter shell with a "Luger" stamp in the Hotel room. Surveillance footage showed an individual holding the door open for Spence and Wynn and remaining in the room for a little over one minute. After that time, the three men quickly exited the room and went to the elevator, later followed by the victim, who exited the room holding his stomach. Utilizing a photo array and a photo from a Facebook page of "Mo Humble," officers were able to identify Burgess exiting the hotel room.

On December 23, 2015, police conducted surveillance of Burgess outside a Motel (the Motel). Burgess exited the Motel and entered a vehicle driven by Spence. Police followed the vehicle to a McDonald's where they arrested the defendants. During the course of the arrest, a Cricket cellphone fell to Burgess's feet. Spence informed the police that there were two phones in the vehicle; one was his own LG flip phone, and the other belonged to his cousin Burgess.

4

Forensic examination of the cell phones revealed that on the night of December 21, 2015, Spence and Burgess exchanged more than twenty text messages. The messages contained such information as "everything still a go?" "Yeah, he asleep"; "What's the room number?"; "Little bit of work in the dresser. IDK where the rest is, but I know it's bread in here besides his pockets."; "How far?" "Bout to pull up."; "Search everything and make him get the rest of the bread."; "Hit me when on the floor." The last text message coincided with the arrival of Spence and Wynn to the Hotel, and Burgess letting the two into the room.

During plea negotiations, Spence certified that he "entered the room to steal money and drugs . . . [when the victim] woke up waving a gun and screaming." Spence explained that when he "tried to disarm [the victim] . . . the gun went off," but denied planning to rob the victim or entering the victim's room with a weapon.

All three defendants were tried together, and each testified. Burgess testified that the text messages were all related to the preparation and supply of drugs for sale, not a scheme to rob the victim.

Wynn testified Burgess suggested that the two could make money selling drugs. He further testified that when he entered, he did not have an intent to steal anything, but once inside, the opportunity arose. He testified that he was

unarmed and saw no gun. While he was in the bedroom checking the dresser, he heard a gunshot. He and Spence then ran.

Spence testified that he went with Wynn to the room to sell drugs. He testified that when Burgess let him and Wynn into the room, neither was armed and the victim was asleep. He testified that the text messages he exchanged with Burgess related to drug dealing. When they arrived, the victim awoke and produced a gun, which fired during a struggle between he and Spence.

The jury found Spence guilty of two counts of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3), one count of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and one count of second-degree certain person not to have a weapon because of a prior conviction, N.J.S.A. 2C:39-7(b)(1). The judge sentenced Spence to an aggregate sentence of fifty years with an 85% parole ineligibility and five years parole supervision pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and the Graves Act, N.J.S.A. 2C:43-6.

The jury found Burgess guilty of two counts of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3), one count of first-degree armed robbery, N.J.S.A. 2C:15-1(a)(3), one count of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and one count of second-degree possession of a firearm for

an unlawful purpose, N.J.S.A. 2C:39-4(a). In a separate proceeding, the judge found Burgess guilty of one count of second-degree certain persons not to have a weapon because of a prior conviction, N.J.S.A. 39-7(b). The judge sentenced Burgess to an aggregate sentence of fifty years with 85% parole ineligibility pursuant to NERA, a concurrent term of eight years for unlawful possession of a handgun, a concurrent term of seven years for certain persons not to have firearms, and a concurrent term of four years for violation of a probationary sentence imposed in 2013.

On appeal, Spence raises the following arguments for this court's consideration:

> POINT I
>
> [SPENCE'S] MULTIPLE MOTIONS FOR MISTRIAL ON THE BASIS OF PROSECUTORIAL MISCONDUCT SHOULD HAVE BEEN GRANTED SINCE [SPENCE'S] RIGHT TO A FAIR TRIAL WAS VIOLATED.
>
> POINT II
>
> IT WAS AN ABUSE OF DISCRETION FOR THE [JUDGE] TO REFUSE TO ADMIT THE [BYSTANDER'S] STATEMENT CONCERNING THE VICTIM'S DYING DECLARATION.

A-3652-18T3

POINT III

THE REFUSAL OF THE [JUDGE] TO ADMIT
PHOTOGRAPHS OF THE VICTIM BRANDISHING
FIREARMS WAS ERROR WHICH DEPRIVED
[SPENCE] OF A FAIR TRIAL.

POINT IV

CONDUCT BY THE PROSECUTOR IN
QUESTIONING WITNESSES AND COMMENTS HE
MADE DURING SUMMATION WERE GROSSLY
PREJUDICIAL AND DEPRIVED [SPENCE] OF A
FAIR TRIAL.

POINT V

THE TRIAL [JUDGE] ERRED IN NOT INSTRUCTING
THE JURY SUA SPONTE ON SELF-DEFENSE AS IT
RELATED TO THE LESSER-INCLUDED OFFENSES
OF MANSLAUGHTER[.]

POINT VI

THE DENIAL OF [SPENCE'S] MOTION TO
SUPPRESS WAS ERROR.

POINT VII

THE FIFTY . . . YEAR NERA SENTENCE IMPOSED
UPON [SPENCE] WAS EXCESSIVE AND SHOULD
BE REDUCED.

POINT VIII

THE ERRORS, EITHER SINGLY OR IN THE
AGGREGATE, DENIED [SPENCE] OF A FAIR TRIAL.

8

In his pro se brief, Spence raises the following arguments on appeal, which we have renumbered:

[POINT IX]

THE TRIAL [JUDGE] VIOLATED [SPENCE'S] SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO HAVE A FAIR TRIAL AND DUE PROCESS BY ALLOWING THE STATE TO VIOLATE CONDITIONS OF THE BRUTON[2] MOTION THAT WAS AGREED UPON BY ALL PARTIES.

[POINT X]

THE TRIAL [JUDGE] COMMITTED REVERSIBLE ERROR WHEN INSTRUCTING THE JURORS ON FLIGHT CHARGES AFTER AGREEING NOT TO DO SO ON BOTH SIDES, BECAUSE OF THE PREJUDICIAL [E]FFECTS ON THE DEFENDANTS.

On appeal, Burgess raises the following arguments for this court's consideration:

POINT I

[BURGESS] WAS ENTITLED TO JUDGMENTS OF AQUITTAL ON THE ROBBERY AND FELONY MURDER COUNTS.

---

[2] Bruton v. United States, 391 U.S. 123 (1968).

9

POINT II

THE TRIAL [JUDGE] IMPROPERLY EXCLUDED OTHER CRIMES EVIDENCE OFFERED BY THE DEFENDANTS.

POINT III

THE PROSECUTOR'S COMMENTS DURING SUMMATION DENIED [BURGESS] A FAIR TRIAL.

POINT IV

THE SENTENCE OF [FIFTY] YEARS IN PRISON, SUBJECT TO THE NO EARLY RELEASE ACT, IS EXCESSIVE.

## I.

Defendants both maintain that several comments made by the prosecutor on summation denied them a fair trial, the trial judge abused her discretion by excluding photographs of the victim, and that their fifty-year sentences are manifestly excessive. We will discuss each of these overlapping arguments in turn.

## A.

Defendants argue that several comments made by the prosecutor during the State's summation denied them a fair trial. Spence specifically argues that the judge erred in denying his motion for mistrial on this ground. Burgess made no such

motion, but nevertheless takes issue with the same comments about defendants and defense counsel and an additional comment about a fact allegedly not in evidence.

The decision to grant or deny a motion for mistrial is "within the sound discretion of the trial judge[.]" State v. DiRienzo, 53 N.J. 360, 383 (1969). "The grant of a mistrial is an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). Therefore, this court will not "reverse a trial [judge's] denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the [judge] otherwise 'abused its discretion.'" Ibid. (quoting State v. Labrutto, 114 N.J. 187, 207 (1989)).

A prosecutor must ensure that their "remarks and actions [are] consistent with his or her duty to ensure that justice is achieved." State v. Ribalta, 277 N.J. Super. 277, 293 (App. Div. 1994). If a prosecutor's conduct does not conform with this expectation, the court's inquiry does not end; such misconduct "is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." State v. Ramseur, 106 N.J. 123, 322 (1987). This requires us to consider "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the [judge] ordered the remarks stricken from the record and instructed the

11 A-3652-18T3

jury to disregard them." State v. Frost, 158 N.J. 76, 83 (1999). We presume that the jury followed any limiting instructions that the judge provided. State v. Loftin, 146 N.J. 295, 390 (1996).

Our court recognizes that "[p]rosecutors are afforded considerable leeway in [summations] as long as their comments are reasonably related to the scope of the evidence." State v. Cole, 229 N.J. 430, 457 (2017) (first alteration in original) (quoting Frost, 158 N.J. at 82). They can "strike hard blows . . . [but not] foul ones." State v. Echols, 199 N.J. 344, 359 (2009) (alterations in original) (quoting State v. Wakefield, 190 N.J. 397, 436 (2007)). It is just as much the prosecutor's duty "to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." State v. Farrell, 61 N.J. 99, 105 (1972) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

When a criminal defendant chooses to testify, they are "not simply another witness." State v. Daniels, 182 N.J. 80, 97 (2004). Although testifying witnesses are typically susceptible to attacks on their credibility, "[p]rosecutorial comment suggesting that a defendant tailored his testimony . . . permit[s] the prosecutor to punish the defendant for exercising that which the Constitution guarantees." Id. at 98.

A-3652-18T3

"A tailoring allegation is a claim that a witness has adapted his testimony to conform to other evidence that has been produced during a trial." State v. Feal, 194 N.J. 293, 305 (2008). Claiming that a defendant tailored his or her testimony to conform to the facts testified by other witnesses is a violation of the defendant's constitutional rights as it undermines a defendant's right to a fair trial. Daniels, 182 N.J. at 97-98. Prosecutors are prohibited from making general accusations of tailoring, or attacks against the defendant's credibility in the absence of any "specific evidentiary basis that defendant has tailored his testimony[.]" Id. at 98. A prosecutor, however, may make specific allegations of tailoring, but in a limited fashion. Id. at 98-99. "The prosecutor's comments must be based on the evidence in the record and the reasonable inferences drawn therefrom." Id. at 99. It is impermissible for a prosecutor to explicitly "reference the defendant's attendance at trial or his ability to hear the testimony of preceding witnesses" as the basis for defendant's ability to tailor his testimony. Ibid. Moreover, it is improper for a prosecutor to cast aspersions on defense counsel. Frost, 158 N.J. at 86; State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008).

Defendants take issue with three separate remarks in the State's summation which touch on defendants' and defense counsel's presentation and alleged tailoring

of evidence.  First, defendants challenge the prosecutor's remarks that the defense has presented no evidence:

> So there are not other messages that were left off those pages because they explain that this was really all about drugs and not about a robbery.  Do you know how you can be confident?  Because the attorneys had the exact same discs.  They could have made any report they wanted.  They could have picked out any test they wanted to that supported their arguments, that showed what this was all about, that showed that this was just a big misunderstanding and that flames actually means Bic lighters or whatever, but they didn't show you that because it doesn't exist.

Second, defendants challenge the prosecutor asserting that the defendants were attempting to tailor their testimony to the evidence at trial:

> What you heard last week was three people who made a conscious choice in 2015 to participate in these events and are now trying to avoid the consequences.  The evidence is not consistent with their testimony.  They molded their testimony to try to fit the evidence that you saw two weeks ago.  And, ultimately, the pieces that they submit through their testimony, through their story, just doesn't fit.

Third, defendants challenge the prosecutor's comments about defendants and defense counsel:

> Plan B is, I suggest to you, an invention of the defendants and their attorneys trying to account for why these guys were really snooping around a sleeping man's room.
>
> . . . .

So [Spence's counsel] said yesterday that Spence testified because he wanted to tell you the truth, and in a few minutes I think I'm going to be able to prove that that's quite the opposite. But, first, we know that back in 2017. . . Spence wrote a letter that tells a pretty different story than he told you on Friday. So this is another piece to the puzzle that they introduced that doesn't really fit. In that letter he mentioned nothing about selling drugs or being friends with [the victim] or Trenton guys or seeing [the victim] walk to the bedroom. Instead he says that [the victim] woke up waving a gun and screaming.

So why should we accept that he wanted to tell you the truth on Friday when two years ago he certified that that was the truth? Back then he admitted that all three men were in on this plan to sneak into the room and steal [the victim's] stuff. That's illegal, too. It's called a burglary, and that can also be the basis for felony murder.

So Spence told us on Friday that that letter wasn't true, that they were not there to steal. His attorney seemed to disagree, because they're the ones who kind of keep referring to Plan B. In fact, one person even said -- they acknowledged that maybe Plan B was actually Plan A. They even go so far as instructing you, I know at least two of the attorneys did, I don't know if three did, instructing you to convict of attempted theft.

Spence's defense counsel objected and moved for a mistrial. Counsel took issue with the prosecutor accusing defense counsel of "sinisterly characteriz[ing] evidence" and "trying to distort the evidence." Counsel also objected to the prosecutor attempting to "put[] the burden on the defense, saying the defense had two years to present this evidence that would have helped their case, knowing that

15

[defendants] don't have a constitutional obligation to do anything." Finally, counsel argued against the prosecutor "say[ing] that . . . these stories were the invention of the defendants and their attorneys, implying that the defense attorneys deliberately commit[ted] legal malpractice, enter[ed] into unethical conduct, and coached their defendants to provide testimony that isn't true." The judge denied the motion and stated that she would instruct the jury that "they're only to consider the . . . testimony and the evidence and the law that [she] give[s] them."

Defendants also contend the prosecutor made improper comments regarding the trajectory of the bullet that killed the victim. Defendants maintain that since the medical examiner offered no opinion on the trajectory of the bullet, the prosecutor's opinion as to how it could or could not have been fired is an improper expert opinion, which was not based upon the facts in evidence. See State v. Papasavvas, 163 N.J. 565, 616 (2000) (noting that while a prosecutor may present to the jury the State's theory of the case, the presentation will constitute prosecutorial misconduct if it draws reasonable inferences from evidence not adduced at trial).

The medical examiner described the path of the bullet as follows:

> The bullet traveled right to left, front to back and downwards. It passed through the abdominal cavity. It did not strike any of the intestines or organs of the abdomen. It passed through a large artery and vein called the iliac artery and vein. The main artery in the body is the aorta -- that's the largest one. It branches as it goes

16

down to the right and left iliac arteries, one goes to the right side, one goes to the left. And it passed through the left iliac artery and vein and then I followed the path up further and I found a jacketed bullet from the tissues near the top of the femur, the thigh bone, on the left.

The prosecutor commented the following:

And trust [the victim]. Trust his body. His body contains evidence that he was shot from somewhat of a distance and from above. His body, his wound, is evidence that [defendants'] version and the defense's version is not physically possible. And he can't be here to testify and tell us himself, but that wound you can take as evidence.

Defense attorneys can say whatever they want, and they have, about the way that [the victim] chose to make his way in the world, but his body can't lie. It can't exaggerate. The wound can't downplay things or exaggerate things. It's physical evidence. It's evidence that I submit will leave you firmly convinced that this was not just some big misunderstanding. It's evidence that will leave you firmly convinced that these three men knew exactly what they were doing that night. They knew the risks involved, and they did it anyway. Evidence that will leave you firmly convinced that these three men are responsible for that one gun, that one bullet, this one death. Choices and consequences.

Spence's defense counsel again objected to the prosecutor "offer[ing] expert testimony in his closing" which was not borne out by examination or cross-examination, suggesting that the "shooting could not have happened in the way that the defendant said it did," and moved for a mistrial. The judge provided the jury a

17

limiting instruction "as to some of the items that [defense counsel] raised with respect to expert testimony."

None of the above passages rise to the level of prosecutorial misconduct that could not be cured with a proper limiting instruction. The comments about defense counsel tailoring are improper, as the prosecutor may not attack defense counsel's credibility in this manner. See Frost, 158 N.J. at 86. However, because the prosecutor only directly a single comment towards counsel, a limiting instruction could cure any perceived prejudice. The comments about defendants' tailoring also are not fatal here. The prosecutor did not make a generic tailoring accusation, nor did he allege that defendants tailored their testimony based on their ability to hear preceding witnesses' testimony at trial. See Daniels, 182 N.J. at 99.

The judge provided a limiting instruction that addressed each of the allegedly improper statements:

> Now you've heard all of the evidence, and I do -- I want to give you a couple instructions right now based upon what you just heard in the State's summation. I'm going to ask you and tell you that you need to disregard any comments relative to the defense attorneys. So, in other words, any comments that were made as to the preparation by the defense attorneys as to their client should not pay -- or you should not give that any consideration in your deliberations. That should go out of your mind and that's not to play any part in your deliberations.

> You can consider the defendants themselves, their testimony and their credibility and what weight you give that is something that the jury can decide. But, again, any comments made about the attorneys themselves doesn't play any part in your deliberations. Does everybody understand that? Yes. Okay.
>
> Also, you heard comments in summation that the defense did not show you certain things, whether it was video or otherwise. I have to tell you and I'm going to give you a complete instruction on this, but I just want to tell you right now so it's fresh in your mind that the defendants do not have any obligation to present any proof as to their innocence. That burden is on the State. They have to prove each and every element of the charged beyond a reasonable doubt. That never transfers to the defendants, so they don't have any obligation. And, again, I'm going to give you a complete instruction on that, but does everybody understand that?

We presume that the jury followed the limiting instructions and did not consider the statements made by the prosecutor for any improper purpose. Loftin, 146 N.J. at 360. The statements do not amount to prosecutorial misconduct, defense counsel made timely objections to each statement, and the judge provided adequate limiting instructions to remove any potential prejudice. A mistrial was therefore not warranted, and the judge did not err in denying Spence's motion. It follows that Burgess was not denied a fair trial based on these same statements.

19

Burgess also maintains that the prosecutor's reference to Urban Dictionary[3] to define the term "flame" during summation was improper. He specifically alleges that the definition was a fact not in evidence. In reference to one of Burgess's text messages, the prosecutor noted that defendants claimed that "flames" referred to heroin, and then quoted from Urban Dictionary, which he claimed defined the term "flames" as a handgun. The record reveals—and the State does not dispute—that it was not a fact in evidence. The State maintains, however, that it was only responding to an argument made by Burgess's defense counsel during summation.

The judge noted that because defense counsel had used a different Urban Dictionary definition, despite it not being a fact in evidence, it was only fair to allow the State to respond. The judge emphasized that the comments were not evidence. The judge reiterated, upon defense counsel's request for a limiting instruction, "I gave a limiting instruction that [the jury is] not to consider anything that wasn't in evidence so . . . I've done that." Such instruction was sufficient to remove any prejudice, especially where both parties were given the opportunity to speak on the same fact. See State v. Murray, 338 N.J. Super. 80, 88 (App. Div. 2001) (noting that courts should consider "the context in which the challenged [comments] were made,

---

[3] Urban Dictionary is a crowd-sourced, unpublished online dictionary for slang words and phrases.

determining whether the remarks were a measured response to defendant's summation made in an attempt to 'right the scale'").  Burgess was not denied a fair trial on this ground.

B.

We next address defendants' argument that the trial judge erred by excluding photographs of the victim holding firearms.  Defendants argue that the victim's potential access to firearms was material and relevant to the defense theory that the victim was armed at the time of the incident.

"A trial [judge]'s evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion[.]"  State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).  We may not "substitute [our] own judgement for that of the trial [judge], unless the trial [judge]'s ruling was so wide of the mark that a manifest denial of justice resulted."  Ibid.  (quoting Marrero, 148 N.J. at 484).

Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action."  N.J.R.E. 401.  In making this determination, the trial judge "should focus on the logical connection between the proffered evidence and a fact in issue," and "whether the [evidence offered] 'renders the desired inference more probable than it would be without the evidence.'"

21

State v. G.V., 162 N.J. 252, 263 (2000) (alteration in original) (quoting State v. Davis, 96 N.J. 611, 619 (1984)).

Evidence that is relevant may still be excluded. N.J.R.E. 403 permits a trial judge to exclude evidence "if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." A trial judge "has broad discretion to exclude evidence as unduly prejudicial pursuant to N.J.R.E. 403." State v. Jackson, 243 N.J. 52, 65 (2020) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)).

The trial judge initially examined the two photographs and noted that, acting as a layperson, she "[could not] tell what portion of the rifle [was visible]" or "if it is even a rifle in either photograph." Although defense counsel asserted that the photographs could be authenticated by Officer Yeates, who extracted the pictures from the victim's phone, the judge was still concerned that he would be unable to tell whether the photograph was taken by the victim himself or by another person in the room. The judge noted that in one photograph she could see one hand, suggesting that the photo may have been taken by the victim, but the other photograph she did not see either hand, making it unclear whether the victim or someone else took the photograph.

A-3652-18T3

Defense counsel also explained that because the photographs of the victim allegedly holding firearms did not have a timestamp, the November 26, 2015 timestamp provided was an estimated date based on those photographs' vicinity to other photographs found on the victim's phone. Based on the alleged timestamp, these photographs are nearly a month old, and do not depict a handgun the defendant alleged that the victim had on his person the day of the incident.

The judge explained her N.J.R.E. 403 analysis, and repeated her concerns that the photographs could not be properly authenticated, and even if they could, they may confuse the jury:

> Clearly, again, as has been argued by the defense, they do not know the date, again, of the photograph. They do not know who took the photograph. Even if it were to come in and they could authenticate it and there was a foundation laid, there's no other information that the jury is going to be provided. They're going to be given two photographs purporting to be the victim holding some type of item, possibly two different items, and that's really all they're going to know.

For these reasons, the trial judge excluded the photographs, determining that "even the relevancy and probative value is substantially outweighed by the risk of undue prejudice, but more so confusion of issues and misleading the jury." As such, we conclude that the trial judge did not abuse her discretion by excluding the photographs.

## C.

We now address defendants' argument that their sentences are manifestly excessive. The judge sentenced both Spence and Burgess to fifty-year aggregate sentences subject to NERA. In addition to his excessive sentence argument, Spence maintains that the judge erred by not considering four mitigating factors when imposing his sentence and that she wrongly stated that she was "required to impose a sentence at the higher end of the sentencing range." Burgess also contends that trial judge erred by failing to consider the real-time consequences of NERA when imposing his sentence.

We review the trial judge's sentencing decision for an abuse of discretion. State v. Blackmon, 202 N.J. 283, 297 (2010). We will not disturb a trial judge's sentence unless it is manifestly excessive or unduly punitive. State v. O'Donnell, 117 N.J. 210, 215-16 (1989). We will consider "whether the trial [judge] . . . made findings of fact that are grounded in competent, reasonably credible evidence and whether 'the factfinder [has] appl[ied] correct legal principles in exercising its discretion.'" Blackmon, 202 N.J. at 297 (third and fourth alterations in original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)).

In reviewing a sentence, "[a]n appellate court is not to substitute its assessment of aggravating and mitigating factors for that of the trial court." State v. Bieniek,

200 N.J. 601, 608 (2010). We will not set aside a sentence unless "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting Roth, 95 N.J. at 364-65).

A trial judge "must identify any relevant aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b) that apply to the case." State v. Case, 220 N.J. 49, 64 (2014). The trial judge must then "determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how [her or she] arrives at the appropriate sentence." O'Donnell, 117 N.J. at 215. The findings supporting these factors "must be supported by competent, credible evidence in the record." Case, 220 N.J. at 64.

As to Spence, the trial judge reviewed the record and found three aggravating factors and no mitigating factors. The trial judge found aggravating factors three, six, and nine, and gave significant weight to each. As to factor three, the trial judge determined that Spence would likely commit another offense based on his "prior record and his escalating violent lawlessness[.]" As to factor six, the trial judge determined that "while [Spence's criminal record is] not lengthy, [it] does include a prior gun related offense, as well as a CDS conviction." As to factor nine, the trial

judge determined that "[t]here is a very strong need to deter [Spence] specifically . . . from violating the law." This was because "[Spence] has now been convicted of the most serious offense in the criminal code . . . . He needs to be deterred and others need to know that violation of the law that results in the taking of a life, any life, will meet with serious consequences and a serious sentence."

The trial judge did consider Spence's request that mitigating factor one apply, but she declined to do so because "[t]he evidence at trial confirmed, and the jury found that [Spence] undertook to rob the victim and that he possessed a gun during the commission of that crime." This fact shows that to some extent, Spence contemplated that some harm would come from his actions.

Spence argues that the trial judge should have considered mitigating factors three and four during sentencing based on victim "brandish[ing] a gun at him and [being] shot during a struggle" and that none of the aggravating factors warranted "great weight." But the trial judge reviewed the record and found that none of the mitigating factors applied to Spence's circumstances, and this court may not "substitute [our] assessment of aggravating and mitigating factors for that of the trial court." Bieniek, 200 N.J. at 608. It does not appear that the trial judge felt that she was "required" to impose an upper-range sentence, but rather she was explaining that based on finding only aggravating factors and no mitigating factors, it logically

26                                                                                    A-3652-18T3

followed that she would impose a sentence in the upper range. The trial judge did not impose an excessive sentence.

As to Burgess, the trial judge reviewed the record and found three aggravating factors and no mitigating factors. The trial judge noted that Burgess had a "prior record . . . and escalating lawlessness [which] shows that given the opportunity he would reoffend," had a prior history which makes this his "third offense for gun possession", and lesser forms of punishment have failed to deter him. Burgess was arrested multiple times as a juvenile, including for robbery and unlawful possession of a firearm, for which he served three years in a juvenile detention facility. The trial judge also noted that Burgess had three convictions as an adult, including one for third-degree burglary for which he received three years' probation. While on probation, Burgess incurred new charges.

At sentencing, Burgess argued that the trial judge should have considered numerous mitigating factors, such as the fact that he did not intend to cause or threaten harm, that he did not contemplate serious harm, that he was provoked, and that he was not aware of his conduct. The trial judge rejected considering any of these mitigating factors because the jury found that Burgess intended to help rob the victim, there was "absolutely no evidence" of provocation and "absolutely nothing

in the record to [excuse or justify defendant's conduct]," and not being aware of one's conduct because of age was not applicable to Burgess's situation.

There is no reason to second-guess the trial judge's application of the sentencing factors as to Burgess. Nor can it reasonably be said that the trial judge failed to consider "the real-time consequences of [NERA]" when imposing "nearly a life sentence." The trial judge considered the consequences before sentencing Burgess and the sentence imposed is not excessive.

## II.

Spence raises four additional separate arguments on appeal. These include that the trial judge erred by denying two additional motions for mistrial based on comments made by a witness and the prosecutor, that the trial judge abused her discretion by declining to admit the bystander's statement to the police, that the trial judge erred in not sua sponte instructed the jury on self-defense, and that the trial judge erred in denying his motion to suppress cellphone evidence. We address these arguments in turn.

## A.

We first address Spence's argument that the trial judge erred by denying two other motions for a mistrial based on statements made by a witness and by the prosecutor.

28                                                                                          A-3652-18T3

First, Spence argues that a statement made by Detective Jason Dorn (Dorn) during his counsel's cross-examination regarding the fact that Dorn believed Spence invoked his right remain silent during an interview warranted a mistrial. The examination proceeded as follows:

> [SPENCE'S COUNSEL]: Well, after that interview you indicated on direct that [R.S.] was let go, correct?
>
> [DETECTIVE DORN]: He -- [R.S.] was let go; that's correct.
>
> [SPENCE'S COUNSEL]: Okay. . . . Spence was also let go that day, correct?
>
> [DETECTIVE DORN]: Not that I remember. You know, I didn't have much interaction with . . . Spence. I believe he invoked his right --
>
>    . . . .
>
> [SPENCE'S COUNSEL]: Judge, I make a motion for a mistrial. That was not in response to my question and he just said that . . . Spence invoked his rights. It's obvious to the jury now that he didn't speak to the police, so -- and I think that's -- obviously, I think it's -- I can't think of the name of the case, but basically, I mean, that's something that the jury shouldn't have been told.
>
> THE COURT: I agree. They shouldn't, either, but --
>
> [PROSECUTOR]: But, also, counsel did open the door and counsel did pursue a follow-up question after the witness said that he didn't have much interaction with . . .

Spence. I don't think (indiscernible) instruction, especially because he barely got it out.

. . . .

[SPENCE'S COUNSEL]: I am making a motion for a mistrial.

THE COURT: Okay. All right. The only thing I'm going to do at this point is I'm going to give a limiting instruction, so I can hear you as to what you want me, if anything, to say. I know what I'm going to kind of say, but is there anything in particular from the defense's team, since I'm going to deny your motion for a mistrial at this point.

After discussion as to the content of the instruction and whether to instruct the jury at that moment or whether to wait until the end of the presentation of the case, the parties agreed that the jury should be instructed at that moment. The trial judge then instructed the jury:

I give limiting instructions or instructions as to what you should disregard based upon an objection or statement from a witness. In this case there was a response from the detective to or a comment by the detective in response to a question asked by [Spence's counsel], and that last question dealt with whether or not he spoke with the defendant. Any answer he gave to that I want you to disregard. It is not proper for you to consider. Any answer that he may have given to that response, anything that you may have heard, you should put it out of your mind. It's not to play any part in your deliberations in this case at any time. It's not for your consideration.

A-3652-18T3

Spence's counsel made a timely objection, and both parties quickly recognized the error made by Dorn in mentioning that Spence may have invoked his right to remain silent. The judge promptly provided a limiting instruction to the jury to ensure that they do not consider the statements during their decision-making. The trial judge did not abuse her discretion by denying the motion for a mistrial based on this statement.

Next, Spence argues that the prosecutor's question to him regarding whether he told anyone his version of events in 2015 warrants a mistrial. The examination proceeded as follows:

> [PROSECUTOR]: Have you discussed your testimony with your co-defendants?
>
> [SPENCE]: No, I can't because you have us on keep separate so we can't get next to each other.
>
> [PROSECUTOR]: In 2017 -- excuse me. Now the story that you told [Spence's defense counsel] today, you didn't tell that to anyone in 2015, correct?
>
> [SPENCE'S COUNSEL]: Objection, Judge. Can we approach?
>
>     . . . .
>
> [SPENCE'S COUNSEL]: My motion for a mistrial, he just asked whether or not he told anybody. The jury already knows that he can assert his rights. But my prior motion for a mistrial, once he's been read his Miranda rights, he can't be asked questions about whether or not he

31

gave a particular story and it violates his right to remain silent. Again, it's an audio tape, so I'm going to have to hook it up. I know you can't ask questions about somebody telling a different story if they asserted their Fifth Amendment rights after they've read the <u>Miranda</u> rights to them by that point.

The parties agreed that the prosecutor's question was improper, and after the judge denied defendant's motion for a mistrial, she gave the following limiting instruction before proceeding:

All right. Members of the jury, I'm going to give you another instruction. I'm going to direct that you're to disregard the last question, not to speculate as to what that question meant or what the response might have been. And so just disregard that, put it out of your mind as if it never happened. Can everybody do that and make sure it doesn't play any part in your deliberations in this case? Can everybody do that? Yes. Okay.

Spence's counsel made a timely objection, the parties quickly recognized the error, and the judge gave the jury a limiting instruction. The error was not such egregious prosecutorial misconduct as to warrant granting Spence's motion for a mistrial, and the trial judge did not abuse her discretion by denying the motion.

## B.

Next, we turn to Spence's argument that the trial judge abused her discretion by refusing to admit a recorded statement made by the bystander

32

hours after the incident. Spence asserts that the statement provided by the bystander qualifies as a dying declaration and excited utterance and should therefore be admitted.

As stated previously, "a trial [judge]'s evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion[.]" Brown, 170 N.J. at 147 (quoting Marrero, 148 N.J. at 484). We may not "substitute our own judgement for that of the trial [judge], unless the trial [judge]'s ruling was so wide of the mark that a manifest denial of justice resulted." Ibid. (quoting Marrero, 148 N.J. at 484).

"Hearsay is an out-of-court statement offered 'to prove the truth of the matter asserted' therein." State v. R.K., 220 N.J. 444, 459 (2015) (quoting N.J.R.E. 801). Hearsay is not admissible unless there is an exception provided within the rules of evidence or other laws. N.J.R.E. 802. Hearsay within hearsay may be admitted "if each part of the combined statement conforms with an exception to the rule." N.J.R.E. 805.

The excited utterance exception permits admission of "[a] statement relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition and without opportunity to deliberate or fabricate." N.J.R.E. 803(c)(2). Because there is no definitive interval of time that is considered sufficient in length for deliberation or fabrication, a trial judge "must

use a fact-specific analysis to determine whether a statement made after a specific period of time will qualify as an excited utterance." State v. Long, 173 N.J. 138, 159 (2002). Although "the hearsay statement need not be contemporaneous with the startling event," there must be a showing that "the interval was brief and the excited state of the declarant continued." Ibid. (quoting State v. Clark, 347 N.J. Super. 497, 506 (App. Div. 2002)). A trial judge must also consider whether there has been opportunity to deliberate or fabricate by considering "the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance." Ibid. (quoting State v. Williams, 106 N.J. Super. 170, 172 (App. Div. 1969)).

The dying declaration exception permits admission in a criminal proceeding of "a statement made by a victim unavailable as a witness . . . if it was made voluntarily and in good faith and while the declarant believed in the imminence of the declarant's impending death." N.J.R.E. 804(b)(2).

The trial judge first recognized that the bystander's statement involved "hearsay within hearsay. Everybody agrees with that." The judge noted that the victim's statement did not "directly relate[] to the event itself, but his concerns about police locating potentially something illegal, or illegal items in his room." As a result, the judge explained that "the nature of the utterance itself . . . seems to be

something other than what the exception to [N.J.R.E.] 803(c)(2) provides." But even if that was not the case, the judge explained that the bystander's statement to the police could not fall within the excited utterance exception. The judge explained that during his video statement, the bystander appeared "relatively calm in light of the events that he did observe" and "[h]is thoughts appear[ed] to be collected and ma[de] sense given the questions that were asked." The bystander appeared "comfortable . . . and [did not] seem at all to be what [the trial judge] would observe as being excited in any form of the matter." The trial judge explained noted that she "d[id] not see that [the bystander was] in any way what we would describe as shocked and uttering things about the event. His thoughts, again, seem to be cohesive."

Further, the trial judge noted that the bystander's statement occurred "[seventeen] or [eighteen] hours later," which would have given him "time to deliberate, maybe not fabricate, but . . . have an opportunity to deliberate about the events before he was interviewed at a set time." Combined with the bystander's "uncertainty" and "poor recollection" of the situation, the trial judge determined that the bystander's statement was unreliable and "the probative value . . . [was] outweighed by the risk of confusion or misleading the jury as to the facts of th[e]

35

case." The trial judge did not abuse her discretion by refusing to admit the bystander's statement.

C.

We now turn to Spence's argument that the trial judge committed plain error by not sua sponte instructing the jury on self-defense.

"'[C]lear and correct jury instructions are essential for a fair trial' because the jury charge 'is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations.'" State v. Martini, 187 N.J. 469, 477 (2006) (alteration in original) (quoting State v. Koskovich, 168 N.J. 488, 507-08 (2001)). We "review [a] trial [judge's] decision not to give [a self-defense] instruction under a plain error standard, in accordance with Rule 2:10-2." State v. Galicia, 210 N.J. 364, 389 (2012).

Self-defense is an affirmative defense, which provides that "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." N.J.S.A. 2C:3-4(a). "A trial judge must sua sponte charge self-defense in the absence of a request . . . 'if there exists evidence in either the State's or the defendant's case sufficient to provide a "rational basis" for its applicability.'" Galicia, 210 N.J. at 390 (quoting

State v. O'Carroll, 385 N.J. Super. 211, 236 (App. Div. 2006)). Evidence from either the State or the defendant's case "must 'clearly indicate[]' such a defense to call for such an instruction in the absence of a request to charge." Id. at 390-91 (quoting State v. Perry, 124 N.J. 128, 161 (1991)). The trial judge is not required "'to meticulously sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain' a lesser charge[.]" State v. Alexander, 233 N.J. 132, 143 (2018) (alteration in original) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)).

Spence testified that when he saw the victim walking into the room with the gun and pointed the gun at him, he "tried to slap the gun away from [the victim] to get it out of [his] face[.]" Spence testified that after he successfully slapped the gun away from the victim and onto the floor, the victim attempted to retrieve the gun. Spence and the victim began to "tussle" and Spence "tried to turn the gun away from him and it went off." Spence explained that throughout the altercation he did not obtain possession of the gun. Although Spence testified that he feared for his life, it does not appear that he intended to fire the handgun for the purpose of protecting himself as required by the self-defense statute. The testimony does not clearly indicate that a self-defense

charge was warranted absent a request by the defense. As a result, the trial judge did not err by not sua sponte instructing the jury on self-defense.

D.

Finally, we address Spence's argument that the trial judge erred in denying his motion to suppress the cellphone seized from his car. He argues that there was no probable cause to seize the cellphone, and that the trial judge wrongfully denied his request for a Franks[4] hearing.

Our review of a determination of a motion to suppress is limited, and we defer to the "motion judge's factual findings so long as sufficient credible evidence in the record supports those findings." State v. Gonzales, 227 N.J. 77, 101 (2016) (citing State v. Elders, 192 N.J. 224, 243-44 (2007)). In other words, we will defer to a trial judge's determination unless it is "'clearly mistaken' or 'so wide of the mark' that the interests of justice require appellate intervention." Elders, 192 N.J. at 245. We will not disturb the findings even if an independent review of the record may lead to a different conclusion. State v. Johnson, 42 N.J. 146, 162 (1964).

We review a trial judge's decision regarding the need for a Franks hearing for an abuse of discretion. State v. Broom-Smith, 406 N.J. Super. 228, 239 (App. Div. 2009). A trial judge abuses his or her discretion when his or her "decision [is] made

---

[4] Franks v. Delaware, 438 U.S. 154 (1978).

without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis." United States v. Scurry, 193 N.J. 492, 504 (2008) (citing Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

In denying Spence's motion to suppress, the trial judge first noted that "the search and communications data warrants . . . were issued and executed consistent with" both the Fourth Amendment of the United States Constitution, as well as Article I, Paragraph 7 of the New Jersey Constitution. Next, the trial judge noted that "[t]he seizure of the phone was proper" because the police had already identified Burgess as a suspect and Spence informed the police that the cellphone belonged to his cousin Burgess.

The trial judge also found that the magistrate judge who issued the search warrant was not misled by the affidavits provided which stated that Burgess was in "possession" of two cellphones, and therefore no Franks hearing was necessary. The trial judge noted that while the use of the word "possession" may have been "unartful[]," it could have reasonably been understood that Burgess had constructive possession over the two cellphones. The trial judge determined that "the affidavit, though not detailed, was not misleading" as a result of the use of "possession." Nor did the use of the word "cousin" cast aspersions on the issuance of the search warrant; as the trial judge explained, "considering the totality of the circumstances,

it was reasonable for police to believe that the phone indeed belonged to . . . Burgess" because "[Spence] had just recently been in the car with . . . Burgess, who he earlier referred to as his cousin."

The trial judge did not abuse her discretion by declining to suppress the cellphone, and the trial judge based her decision to deny a Franks hearing on a rational explanation without any departures from established policies or applications of impermissible bases.

III.

We now turn to Burgess's contention that he was entitled to judgments of acquittal on the robbery and felony murder counts.

A judge shall enter an order for a judgment of acquittal only if "the evidence is insufficient to warrant a conviction." R. 3:18-1. Our Supreme Court articulated the standard to determine a motion for judgment of acquittal in State v. Reyes, 50 N.J. 454 (1967):

> [T]he question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [Id. at 458-59 (citing State v. Fiorello, 36 N.J. 80, 90-91 (1961)).]

A-3652-18T3

That standard applies regardless of whether the motion was made during trial under Rule 3:18-1, or after the jury returned a verdict under Rule 3:18-2. State v. Tindell, 417 N.J. Super. 530, 548-49 (App. Div. 2011). If the motion was made at the close of the State's case, we do not consider any evidence adduced in the defendant's case. Reyes, 50 N.J. at 459; State v. Foreshaw, 245 N.J. Super. 166, 185 (App. Div. 1991).

Under Rule 3:18-1, this court "'is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" State v. Papasavvas, 170 N.J. 462, 521 (2002) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004). We review the judge's denial of defendant's motion for judgment of acquittal de novo, State v. Dekowski, 218 N.J. 596, 608 (2014), and conduct an independent assessment of the evidence, applying the same standard as the trial judge. State v. Williams, 218 N.J. 576, 593-94 (2014).

At the end of the State's case, Burgess moved for judgments of acquittal, arguing that the State had failed to prove he participated in a burglary or robbery, and therefore could not be guilty of felony murder. The judge denied the motion and the jury ultimately acquitted Burgess of burglary. Defendant now challenges the robbery count as a predicate offense to felony murder.

41

To convict a defendant of robbery, the State must prove that in the course of committing a theft, defendant:

> (1) Inflicts bodily injury or uses force upon another; or
> (2) Threatens another with or purposely puts him in fear of immediate bodily injury; or
> (3) Commits or threats immediately to commit any crime of the first or second degree.
>
> [N.J.S.A. 2C:15-1.]

In ruling on the motion, the trial judge cited the correct standard:

> This motion is made under Rule 3:18-1, which is a motion for judgment of acquittal. The case law as cited is State v. Reyes, and the broad test for determination of such an application is whether the evidence at this point is sufficient to warrant a conviction of the charge or charges involved. More specifically, the question the trial judge must determine is whether viewing the State's evidence in its entirety, direct and/or circumstantial, and giving the State the benefit of all favorable testimony, as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable juror could find guilt of the charges beyond a reasonable doubt.

The trial judge accepted the prosecutor's explanation on how he put forth evidence:

> [Burgess's text] messages indicate that a robbery was planned, and that all three people were aware of that. The text messages obviously do not use the word rob and do not use the word gun. You wouldn't expect them to. But the context makes that intent clear. . . .We heard really the evidence of a robbery [which] is in many ways evidence of the burglary. [The victim] is asleep, [defendant] can just walk out. It sure doesn't sound like an invitation . . . particularly one that the actual resident of the room is in

42

on. And so a robbery in this instance is a burglary, but there is certainly no indication that these individuals were invited . . . people don't hide in the stairwell when they're invited. People knock on the door. People don't act [in the way that] defendant did on [surveillance] video.

The trial judge then determined:

[C]learly there is evidence now to support the State's position, again, viewed most favorably to them based upon not just the text messages but the testimony from the witnesses, the detective, the lay witnesses, as well as the expert witnesses as to the location of the phones, and couple that with the video that's been shown to the jury, the [c]ourt does not find that . . . the defense . . . has not met its burden with respect to Rule 3:18-1.

We conclude there exists sufficient evidence in the record from which a reasonable jury could find Burgess guilty of robbery beyond a reasonable doubt. See Reyes, 50 N.J. 458-59. The more than twenty text messages exchanged between Burgess and Spence provide significant circumstantial evidence that defendant facilitated the robbery of the victim. The last of these text message coincided with the arrival of Spence and Wynn, who Burgess admitted to the hotel room. Notably, the text message stating "[s]earch everything and make him get the rest of the bread" evidences Burgess's intention not just to sneak in and steal drugs and money, but to use some degree of force, threat, or intimidation to get those items, which N.J.S.A. 2C:15-1 requires.

Burgess now contends that the State failed to present evidence of a robbery because "detectives recovered $225 in cash from the pockets of [the victim], negating the claim that he was the victim of [a] robbery." The fact that money was found on the victim and drugs were found in the room is of no moment, however, because the record reveals that the robbery ended abruptly when Spence shot the victim. Burgess also contends that he was incapable of robbing the victim because he was a resident of the room and only granted entry to Spence and Wynn. This argument is belied by the forensic text message evidence, lay witness testimony, and surveillance footage showing Burgess helped orchestrate it.

Burgess argues that the State presented "no evidence that defendant had a gun or that he otherwise planned to participate in the robbery." The fact that the victim was shot during the robbery is sufficient to create the inference that one or more of the co-defendants were armed, which would allow the State's case to survive a motion for judgment of acquittal. It is of no moment that the defense later argued in its case-in-chief that it was the victim that was armed. See Reyes, 50 N.J. at 459 (1967) (explaining that if the motion was made at the close of the State's case, this court does not consider any evidence adduced in the defendant's case). As such, the State put forth sufficient circumstantial evidence to survive a motion for judgment of acquittal and the trial judge did not err by denying it.

A-3652-18T3

To the extent that we have not addressed defendants' remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

45

A-3652-18T3